1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF ILLINOIS
2

3    UNITED STATES OF AMERICA,      )
                                    )
4                      Plaintiff,   )
                                    )
5         vs.                       ) No. 13-cr-30042-DRH
                                    )
6    CHRISTOPHER HORTON,            )
                                    ) March 7, 2014
7                      Defendant.   )

8
                        **TRANSCRIPT OF PROCEEDINGS**
9                              **SENTENCING**
            **BEFORE THE HONORABLE DAVID R. HERNDON**
10          **CHIEF UNITED STATES DISTRICT COURT JUDGE**

11   **APPEARANCES:**

12   For the Plaintiff:          Ali M. Summers, Esq.
                                 Assistant U.S. Attorney
13                               9 Executive Drive
                                 Fairview Heights, IL  62208
14                               (618) 628-3700

15   For the Defendant:          Thomas C. Gabel, Esq.
                                 Federal Public Defender
16                               650 Missouri Ave.
                                 East St. Louis, IL  62202
17                               (618) 482-9050

18   Court Reporter:             Laura A. Blatz, CSR, RPR, CCR
                                 U.S. District Court
19                               750 Missouri Avenue
                                 East St. Louis, IL  62201
20                               (618) 482-9481

21

22

23

24        Proceedings recorded by mechanical stenography;
     transcript produced by computer.
25

<u>INDEX OF WITNESS EXAMINATION</u>

|  | DX | CX | R-DX | R-CX | FR-DX |
|---|---|---|---|---|---|
| David Vucich | 13 | 30 | | | |

\*   \*   \*   \*

**INDEX OF EXHIBITS**

| EXHIBIT | DESCRIPTION | ID'D | ADMT'D |
|---|---|---|---|
| Govt. 4 | Picture of the inside of Three T's karate studio | 20 | 21 |
| Govt. 2 | Printout from forensic report of the "Notes" section of I-Phone | 22 | 26 |
| Govt. 3 | Handwritten letter by the Defendant | 28 | 29 |
| Govt. 5 | Statistical chart from the Certification Review Branch Report, updated 3/1/14 | 30 | |

1          *(Court convened)*

2               THE COURT:  Let the record reflect that we're in

3     open court.  We've called the matter of *United States of*

4     *America vs. Christopher Michael Horton*, Case No. 13-30042.

5     Government present, represented by Assistant United States

6     Attorney Ally Summers.  Good morning, Ms. Summers.

7               MS. SUMMERS:  Good morning, Your Honor.

8               THE COURT:  Defendant's present in court together

9     with his counsel Thomas Gabel.  Good morning, Mr. Gabel.

10              MR. GABEL:  Good morning, Your Honor.

11              THE COURT:  Good morning, Mr. Horton.

12              We've called this case for the purpose of

13    sentencing.  That means that the Court will examine this

14    case pursuant to 18 United States Code, Section 3553(a), in

15    order to determine an appropriate sentence.  In doing so,

16    the Court will consider all appropriate and relevant factors

17    in order to arrive at individualized sentence for

18    Mr. Horton.  There will be a thorough adversarial test

19    before the Court, contemplated by the federal sentencing

20    procedure, and, of course, the Court will grant adequate

21    time to both sides the accomplish that task.

22              The Supreme Court directs the sentencing judge to

23    examine and treat the Sentencing Guidelines, which have been

24    promulgated by the United States Sentencing Commission, as

25    the, "starting point and the initial benchmark".  The Court

1    is prohibited by law, however, from presuming the

2    reasonableness of a guideline sentence, and will not do so.

3    Sentencing Guidelines are considered to be considered by

4    this Court as advice.  Once the Court determines what the

5    guidelines are and what advice, therefore, the Commission

6    has given to this Court, it must determine whether, based on

7    a close examination of the sentencing statute which I

8    mentioned previously, whether that advice is sound in this

9    case for Mr. Horton or whether the Court should reject that

10   advice and vary from the guidelines, which in this case

11   would be a variance below the guidelines since there is no

12   room above the guidelines.

13        Although in the *Gall* case, the Supreme Court has

14   instructed sentencing Courts who choose to vary from the

15   guidelines to adequately explain any such variance from the

16   guidelines.  In the words of the *Gall* court, the sentencing

17   judge, "must consider the extent of the deviation and insure

18   that the justification is sufficiently compelling to support

19   the degree of the variance."  Court will consider any

20   aggravating or mitigating evidence or arguments put forth by

21   the parties.

22        In that regard, the Court has received and has read

23   the sentencing memoranda filed by each of the parties,

24   together with the letters which have been filed by each of

25   the parties, and has examined the DVD submitted by the

1    prosecution as well.  I have considered each of these items.

2    I will continue to consider each of them throughout the

3    sentencing hearing and will analyze -- take them into

4    consideration as I analyze the sentence in this case.  I

5    also have, for purposes of this hearing, and to disclose to

6    the parties, considered the policies of the Bureau of

7    Prisons with respect to its sex offender management program

8    because, of course, there are arguments by the parties with

9    respect to -- particularly by the Defendant with respect to

10   treatment considerations for the Defendant.

11         So as we proceed, let me ask you, Mr. Horton:

12   There was a Presentence Report prepared in this case, as

13   there is in all cases.  The last iteration, if you will, of

14   the Presentence Report was disclosed on February the 27th.

15   Have you received each of the iterations of the Presentence

16   Report, Mr. Horton?

17         *THE DEFENDANT:*  Yes, Your Honor.

18         *THE COURT:*  And did you take the time, Mr. Horton,

19   to read carefully and thoroughly through each of the

20   Presentence Reports, in particular the last revision?

21         *THE DEFENDANT:*  Yes, Your Honor.

22         *THE COURT:*  Did you go over the Presentence Reports

23   with Mr. Gabel, your lawyer?

24         *THE DEFENDANT:*  Yes, Your Honor.

25         *THE COURT:*  And as a result of that process,

1   Mr. Horton, do you understand the Presentence Report?

2          *THE DEFENDANT:*  Yes, Your Honor.

3          *THE COURT:*  Very well.  Mr. Gabel, any objections

4   you want to make me aware of on behalf of your client?

5          *MR. GABEL:*  No objections, Your Honor.

6          *THE COURT:*  Very good.  Ms. Summers, on behalf of

7   the Government, any objections to the Presentence Report?

8          *MS. SUMMERS:*  No objections, Your Honor.

9          *THE COURT:*  Very well.  So without any objections

10  to the Presentence Report, and having gone through the

11  Presentence Report myself, the Court adopts the findings of

12  the probation officer contained within the Presentence

13  Report.  I note that Mr. Horton pled guilty to six counts in

14  this case:  Counts 1 through 5, sexual exploitation of a

15  minor pursuant to 18 United States Code, Section 2251(a),

16  and Count 6, attempted exploitation, sexual exploitation, of

17  a minor, pursuant to the same statutory section, Class B

18  felonies.

19          The probation officer has gone through the

20  guideline calculation for us and published this on page 9 of

21  the Presentence Report, and I will run through this

22  calculation for us.  This is fairly complicated so let me

23  just go through this step-by-step as carefully as I can so

24  that everybody can understand how we get to the ultimate

25  advice of the Sentencing Commission.  We focus -- or we

1    utilize the 2013 edition of the guidelines manual.  That is

2    one that is currently in effect, and, therefore, the proper

3    one to use.  There's no ex post facto issue here.

4         Counts 1 and 2 are grouped together for initial

5    calculation.  This has to do with the person who has been

6    noted as Minor No. 1.  The focus within the manual is on

7    Section 2G2.1, wherein the Commission advises that a Base

8    Offense Level 32 be used, and it is.  The offense involved a

9    minor who had not yet attained the age of 12, and so

10   subsection (b)(1)(A) advises that the Court increase the

11   offense level by four for a specific offense characteristic,

12   and it will be.

13        Next, the offense involved the commission of a

14   sexual act or sexual conduct -- in this case, oral sex --

15   and, therefore, subsection (b)(2)(A) advises that the Court

16   increase the offense level by two, and it will be.

17   Subsection (b)(5) of the aforementioned section advises that

18   because the victim was otherwise in the custody, care, or

19   supervisory control of the Defendant due to his employment

20   as a karate instructor, that another two levels be added to

21   the offense level, and it will be.  So the adjusted offense

22   level for that group is a 40.

23        The next grouping relates to Minor No. 2, Counts 3

24   and 4, and they're grouped together for purposes of this

25   calculation.  Once again, 2G2.1 advises a Base Offense Level

1     32 be used, and it will be.  Once again, the minor was under

2     the age of 12, this one being 6, so the guideline advises

3     that four levels be increased -- that the offense level be

4     increased by four, rather, and it will be.  Once again,

5     because it involves oral sex, two levels will be added by

6     the advice of the Commission.  Again, another two levels

7     because of the Defendant's position as a karate instructor

8     and the victim being within his care, custody, or

9     supervisory control.  But on this occasion another two

10    levels are added because the offense involved the use of a

11    computer or interactive computer service to solicit

12    participation with a minor in sexually explicit conduct,

13    this pursuant to subsection (B)(ii).  So the adjusted

14    offense level for this grouping is a 42.

15            The next group relates to Count 5, Minor No. 3.

16    Once again, we begin with a Base Offense Level 32, add four

17    levels because the minor is under the age of 12, being 7

18    years old.  The first grouping, I forgot to mention the

19    minor was 10, by the way.  This one was 7, so we add four

20    levels.  We then add two levels for the sexual contact,

21    which was oral sex again.  We add two levels because the

22    minor was in the Defendant's care, custody, or supervisory

23    control as a karate instructor, so this sub grouping has an

24    adjusted offense level of a 40.

25            We then get to the last grouping, which is Count 6,

1    Minor No. 4, we again begin with a Base Offense Level 32.

2    We add four for the age of the minor, under 12, age 7.  Add

3    two for the attempted sexual contact, display of the

4    genitals.  We add two for the victim being within the care,

5    custody, supervisory control of the Defendant as his karate

6    instructor.  So once again, the adjusted offense level for

7    this grouping is a 40.

8            So Group 1 was a 40; Group 2 was a 42; Group 3 was

9    a 40; Group 4 was a 40.  They all count as one unit.  Total

10   number of units is four.  The greater of the offense levels

11   of the different -- of the four groups was the 42, if you'll

12   recall.  We take the four units, which added up to four; we

13   add that to that 42; we come up with a 46.

14           We look to Chapter 4 under 4B1.5(b)(1) because the

15   Defendant engaged in a pattern of activity involving

16   prohibited sexual conduct.  The Commission advises that the

17   Court add five levels, and it will.  We're now at a level

18   51.  The Defendant, however, did -- or has, rather, accepted

19   his responsibility in this case.  So under 3E1.1(a), two

20   levels are removed.  Now we're down to 49.

21           Ms. Summers, the Government can increase that

22   reduction by one by way of a motion before the Court.  Does

23   the Government so move?

24           *MS. SUMMERS:*  Yes, Your Honor, we do move for that

25   one-level reduction.

1          THE COURT:  Very well.  That motion, of course, is

2     granted, and so we're now down to an offense level of 48;

3     however, the guideline doesn't go as high as a 48.  The

4     guideline only goes as high as a 43.  So pursuant to

5     Chapter 5, part A, Comment 2, in the rare instance where the

6     Defendant's total offense level is in excess of 43, the

7     Commission guides the Court to reduce the offense level down

8     to a 43, which is as high as the guideline goes and as high

9     as the advice of the Commission supplies this Court.

10          The other part of the equation, in order to

11     determine the advice from the Commission, is to examine the

12     Defendant's criminal history.  He has none.  He has zero

13     criminal history points, which means that the Defendant's

14     criminal history category is a 1.

15          So the Commission's advice to this Court is, with a

16     total offense level 43, criminal history category 1, that

17     the Court incarcerate the Defendant for his life; that

18     supervised release, should the Defendant be released from

19     prison, be from a period of time five years to life; that

20     there be no probation for the Defendant; that there be a

21     fine range of 25,000 to 250,000.  Restitution I'll speak of

22     in a moment.  The Special Assessment I'll speak of in a

23     moment.

24          Now, there is the matter of the statutory treatment

25     in this case, and that is this:  A minimum of 15 years,

1    maximum 30 years for each of the Counts 1 through 6.  So

2    when one is wondering how to deal with the Commission's

3    advice of life, the guidelines provide that if there's a

4    statutory maximum that does not reach life, the guidelines

5    advise the Court to stack the counts to reach life.  In

6    other words, give the Defendant consecutive sentences in

7    order to follow the advice of the Commission.  Supervised

8    release statutorily, Counts 1 through 6, 5 years to life.

9    Probation is simply not available to the Court for this

10   Defendant by statute.  Fine range, no more than a quarter

11   million dollars for each count, the exposure to the

12   Defendant being one-and-a-half million dollars.

13          There is restitution in this case, what is reported

14   to me as a total of $3,250, divided in various amounts to

15   the victims' families.  There's a Special Assessment, each

16   federal felon must pay $100 per count.  There's six counts

17   here, so the Defendant will be ordered to pay $600 in

18   Special Assessments.

19          So as we started this hearing out, I said the

20   obligation of the Court is to determine whether to follow

21   the advice of the Commission, which in this case is life, or

22   whether to -- determine whether to reject that advice and

23   impose a sentence at a point somewhere less than this

24   Defendant's life in prison.  In order to do that, I have to

25   examine the statutory factors, which include nature and

1   circumstances of the offense, history and characteristics of

2   the Defendant; need for the sentence imposed to reflect the

3   seriousness of the offense, promote respect for the law,

4   provide just punishment for the offense; need to afford

5   adequate deterrence to criminal conduct; need to protect the

6   public from further crimes of the Defendant; need to

7   consider the kinds of sentences available, which in this

8   case is only incarceration; consider the advisory Sentencing

9   Guidelines, which is to consider the advice the Commission

10  has given us, or given the Court, which I've just gone

11  through, and any other policy statements the Commission has

12  in place or about to be in place; the need to avoid

13  unwarranted sentencing disparities among Defendants

14  everywhere, similarly situated; keeping in mind the

15  Congressional directive for the Court to impose a sentence

16  that is sufficient but not greater than necessary in order

17  to comply with the objectives of the sentencing statute,

18  those that I've just outlined for everyone.

19          So in order to continue with this analysis by going

20  through those factors and applying the evidence in

21  aggravation, evidence in mitigation, including the things

22  I've already mentioned that I have received and considered

23  and continuing to consider, including the memoranda of each

24  party and the letter that I've received, as well as that

25  DVD, we'll turn first to Ms. Summers for the Government's

Direct - David Vucich

1   presentation.

2           MS. SUMMERS:  Thank you, Your Honor.  I would like

3   to call Agent David Vucich to testify.

4        **DAVID VUCICH, GOVERNMENT'S WITNESS, SWORN**

5                   **DIRECT EXAMINATION**

6               **QUESTIONS BY MS. SUMMERS:**

7           COURTROOM DEPUTY:  Please be seated and state and

8   spell your name for the record.

9           THE WITNESS:  David Vucich, V like victor,

10  U-C-I-C-H.

11  Q. (By Ms. Summers)  Agent Vucich, where are you employed?

12  A.  Madison County Sheriff's Office in Edwardsville,

13  Illinois.

14  Q.  How long have you been employed there?

15  A.  Since November 1997.

16  Q.  And what are your current duties with the sheriff's

17  department?

18  A.  I'm a lieutenant in the investigative division.  I run

19  the forensic computer crime unit there.

20  Q.  Do you have additional duties in your job?

21  A.  Yes, I do.

22  Q.  And what is that?

23  A.  I'm assigned to the FBI cyber crimes task force out of

24  Fairview Heights, Illinois.

25  Q.  How long have you been doing that?

                   Direct - David Vucich

1    A.   I believe since 2006.

2    Q.   And what do your duties entail in that capacity?

3    A.   Interviewing of suspects involved in child exploitation

4    and the analysis of digital media.

5    Q.   And in the course of your duties, were you assigned as

6    the lead case agent in the investigation of this Defendant,

7    Christopher Horton?

8    A.   Yes, I was.

9    Q.   When did your investigation begin?

10   A.   On February 11th, 2013.

11   Q.   And how did you receive that -- how did you begin your

12   investigation?

13   A.   We received information from St. Louis County Police

14   Department about an individual that may possibly possess

15   child pornography on his cellular telephone.  That

16   information was relayed to them by the Defendant's mother,

17   who confided in her boyfriend.  He, in turn, contacted

18   authorities.

19   Q.   And how did you proceed then with your investigation?

20   A.   We contacted him, obtained a statement from him, and in

21   furtherance of his statement, we contacted the Defendant's

22   mother.

23   Q.   And did you interview her?

24   A.   Yes.

25   Q.   And when you interviewed her, what, if anything, did she

Direct - David Vucich

1  say?

2  A.  We were able to glean information that she had observed

3  her son, Christopher Horton, observed in sexual activities

4  with people who she personally knew, and that her son was a

5  karate instructor, and that he had performed acts on this

6  individual who he taught karate to.

7  Q.  Did she indicate that the person in the video was a

8  minor?

9  A.  Yes.

10 Q.  And did you eventually make contact with the Defendant

11 in this case?

12 A.  Yes, we did.

13 Q.  Was he arrested that day?

14 A.  Yes.  We requested the assistance of Belleville Police

15 Department to immediately take him into custody.

16 Q.  Did you interview him?

17 A.  Yes.

18 Q.  And was that interview video and audio recorded?

19 A.  Yes, it was.

20 Q.  Just generally what did the Defendant say about these

21 allegations?

22 A.  He admitted that they were true and he admitted that

23 there would be evidence on his cellular telephone to suggest

24 that they were true, evidence that he was involved in sexual

25 acts with three different victims.

Direct - David Vucich

1   Q.   Did he say how he knew these victims?

2   A.   Yes.

3   Q.   What did he say?

4   A.   He said he knew them because he taught them karate.  He

5   was their instructor.

6   Q.   Did he tell you where he had committed these acts with

7   these minors?

8   A.   Yes, he did.

9   Q.   And where did he say these acts occurred?

10  A.   They occurred at 1408 Ash Street in Highland, which was

11  his residence, and they also occurred at the Three T's

12  Karate Studio in Belleville, Illinois.

13  Q.   Did he indicate where in the karate studio he committed

14  these acts?

15  A.   Yes.  There was a room in the -- a small room that is in

16  the back portion of the room that's kind of an open floor

17  plan, but immediately to that open floor plan is a solitary

18  room with a see-through window, two-way mirror.

19  Q.   Okay.  And then he admitted committing sexual acts

20  against a third minor.  Where did he say those acts had

21  occurred?

22  A.   Those acts had occurred while he was out of state in

23  San Antonio, Texas area at that minor's residence.

24  Q.   While he was staying with them?

25  A.   Yes.

Direct - David Vucich

1    Q.  Did he indicate how long he stayed with that family when

2    those acts occurred?

3    A.  I believe it was for several days.

4    Q.  A week or less?

5    A.  Yes.

6    Q.  And I do believe that the Court has been well-versed on

7    the facts of this case so I'm not going to ask you to go

8    into all of the facts, but I do have some -- few more

9    specific questions about the case.  As part of your

10   investigation, did you sieze any digital media from the

11   Defendant?

12   A.  Yes.

13   Q.  What did you take?

14   A.  We siezed his I-Phone, which is a cellular telephone.

15   We also siezed his computer laptop, which was an Alienware

16   laptop.

17   Q.  He had that on him when he was arrested?

18   A.  That's correct.

19   Q.  As well as his I-Phone?

20   A.  Yes.

21   Q.  Did you complete a forensic examination of the I-Phone

22   as well as the laptop and hard drive?

23   A.  Yes.  Myself and Detective Brian Kaberna [ph.], who's

24   also in the forensic unit.

25   Q.  Could you explain what a forensic analysis is.

Direct - David Vucich

 1   A.   Yes.   It's the examination of digital media in such a

 2   manner that the media is extracted without altering so it

 3   can later be presented to the Court.

 4   Q.   During your forensic examination did you recover any

 5   images containing child pornography on the Defendant's

 6   phone?

 7   A.   Yes.

 8   Q.   And what did you recover?

 9   A.   There were over 300 images of child pornography.   We

10   were able to identify those victims and those victims were

11   named in the subsequent indictments.

12   Q.   And for the record, these will be referred to as Minors

13   1, 2, and 3, is that correct?

14   A.   Yes, ma'am.

15   Q.   And those were image files, correct?

16   A.   Yes.

17   Q.   Did you recover any video files?

18   A.   Yes.

19   Q.   And approximately how many video files did you recover?

20   A.   Conservatively speaking, because they were segmented

21   videos, there were approximately 87.

22   Q.   87 videos?

23   A.   Yes.

24   Q.   And in these videos can you see the face of the minors

25   that the Defendant had identified?

Direct - David Vucich

1   A.   Yes, in some of them you could.

2   Q.   Approximately 38 of those videos, is that fair to say?

3   A.   I would say that's a fair assessment, yes.

4   Q.   And that was of Minors 1, 2, and 3, correct?

5   A.   Yes.

6   Q.   And then in the course of your analysis of your

7   examination did you identify a fourth victim?

8   A.   Yes, I did.

9   Q.   And did you identify who that fourth victim was?

10   A.   Yes, ma'am.

11   Q.   And that victim is now referred to as Minor 4, correct?

12   A.   Yes.

13   Q.   Based on the forensic examination of the Defendant's

14   phone, were you able to tell from the videos where these

15   sexual -- these acts of sexual abuse had occurred?

16   A.   Yes, I was.

17   Q.   And where had they occurred, according to the data that

18   you received off of the videos on the phone?

19   A.   One of them appeared to have occurred in a public

20   restroom.  Several of them occurred at the Defendant's

21   residence, and others occurred at the Three T's karate

22   studio while there were actually live sessions going on.

23   Q.   And were there any that occurred in Texas?

24   A.   Yes.

25   Q.   And that was with regard to Minor 3?

Direct - David Vucich

1    A.   That is correct.

2    Q.   Could you -- you did describe the martial arts studio

3    where the Defendant worked and where he admitted that this

4    occurred.   I'm going to show you what's been marked as

5    Government's Exhibit 4.   Is that coming up for you?

6    A.   Yes, ma'am.

7    Q.   And can you please describe what this is.

8    A.   That is a picture of the inside of the Three T's karate

9    studio in Belleville, Illinois.   It's kind of an overall

10   snapshot of the actual studio itself.   As previously stated,

11   depicts the small room to the left with the two-way mirror.

12   Q.   Okay.   Can you -- so this right -- right here, that's

13   the mirror?

14   A.   Yes, where your pen is pointing to, that's correct.

15   Q.   And would you say a mirror or a window?

16   A.   I would say window.

17   Q.   It's -- okay.   Are you able to see out but not see in?

18   A.   Yes, that's correct, I believe.

19   Q.   And then there's a door to that room?

20   A.   Yes.

21   Q.   And that door -- and the door can close and lock, is

22   that correct?

23   A.   Yes, to the best of my knowledge.

24   Q.   And then over here on the other side, is this the

25   entrance to the studio, or one of the entrances?

Direct - David Vucich

1   A.  I'm not sure if that's the main entrance or the entrance

2   is directly behind you.

3   Q.  Right outside of this is the main area of the studio

4   where classes are held, is that correct?

5   A.  Yes, ma'am.

6   Q.  And does this photograph fairly and accurately depict

7   the Three Tigers studio in Belleville?

8   A.  Yes, it does.

9        *MS. SUMMERS:*  Move to admit Government's Exhibit 4.

10       *THE COURT:*  Any objection?

11       *MR. GABEL:*  No objections.

12       *THE COURT:*  Admitted.

13       **(Government's Exhibit No. 4 admitted)**

14  Q. (By Ms. Summers)  So the room depicted in that picture, is

15  that the room that the Defendant described as the place that

16  these acts of sexual abuse had occurred with Minors 1, 2, and

17  4?

18  A.  Yes.

19  Q.  During your forensic examination of the Defendant's home

20  did you find any evidence that would indicate preplanning on

21  the part of the Defendant?

22  A.  Yes, I did.

23  Q.  And what did you find?

24  A.  I examined parts of the cellular telephone, in addition

25  to Detective Kaberna [ph.], and we were able to locate a

Direct - David Vucich

1   section which is commonly referred to as "Notes".  Most

2   cellular devices or portable devices have an application

3   that allows you to type letter or words in in free form as a

4   form of reminders or possibly things to do.

5   Q.  And what did you find in that section?

6   A.  I found notes that he was talking about basically in his

7   own words what appeared to be how to molest children.

8   Q.  I'm going to show you what's been marked as Government's

9   Exhibit 2.  Can you tell me what that is?

10  A.  Yes.  This is a printed page from one of our forensic

11  reports.  It is generated from the Notes section which I

12  previously referred to.

13  Q.  And at the bottom of the -- it's two pages, correct?

14  A.  Yes.

15  Q.  And at the bottom of the first page there is an entry.

16  It's labeled 22.  Does it have a title?

17  A.  Yes.  It has a title under the summary section.

18  Q.  And what does -- what is the title?

19  A.  *What is clubbing?  Drugs, naked, alcohol, dancing, FIG.*

20  Q.  And what is the date of that entry?

21  A.  The creation date is 11/29/2012.

22  Q.  And if you would, please, could you read what that entry

23  says.

24  A.  Yes.

25          *Review, what is clubbing?  Drugs, naked,*

Direct - David Vucich

```
 1        alcohol, dancing, fights.  What drugs should you
 2        really stay away from?  Puberty.  What is gay,
 3        straight, bi?  Most people are bi.  Most people are
 4        bi and don't even realize it.  It's normal to be bi.
 5        I prefer boys over girls.  What parts of your body
 6        will change during puberty?  Deeper voice, taller,
 7        more hair, face and groin and butt.  Wiener will grow
 8        and change.  Your balls will get bigger and it will
 9        sometimes get hard and long but it goes back down.
10        Has that ever happened to you before yet?  Well, if
11        not, it will.  It's okay to play with it too.  You're
12        supposed to.  It feels really good, and in fact, you
13        play with it a lot, it will start to really feel good
14        and then you can do this thing called cum.  White or
15        clear stuff comes out and it feels so amazing.  It's
16        not pee, it's different, but it feels good and
17        everybody does it.  If you haven't already, go ahead
18        and try it yourself sometime.  You can tell me about
19        it too if you want.  Let me know if you tried it in
20        the shower or when you're in bed with the covers over
21        you pretending to sleep.  It feels really good
22        whenever you play with the tip too (show the motions
23        of how it should look).  Play with it (jack off his
24        finger end).  Next time we chat you can tell me about
25        it and let me know how good it feels.  Give it a try.
```

Direct - David Vucich

1    *Everybody does it, they just don't talk about it, but*

2    *me and you can talk about anything, and let me -- if*

3    *you want.  Give it a try and we can talk more about*

4    *it next time.*

5         *And then I have something new to talk to you*

6    *about next time that I bet you will like.  You'll get*

7    *to know about it before any of our friends learn it*

8    *because you're so dang smart.  I learned about it*

9    *when I was eight years old from another friend of*

10   *mine, but always give the jacking off thing a try and*

11   *do it as much as you can, and we will talk more about*

12   *that next time so you can let me know how it feels.*

13        *How's school?  Are your grades picking up?  I*

14   *want you to do great in life so keep those grades up.*

15   *It shows how smart you are and it will help you with*

16   *your college one day.  You can go to college one day*

17   *like I am and learn more cool adult stuff.*

18   *Q.*  Was there a second entry that you found on the

19   Defendant's I-Phone?

20   *A.*  Yes.

21   *Q.*  And was it the very next note or digital entry?

22   *A.*  Yes.

23   *Q.*  And what was the date of that entry?

24   *A.*  Are you referring to No. 23?

25   *Q.*  Yes.  I'm sorry.


                    Direct - David Vucich

1   A.   It appears it was created December 3rd, 2012.

2   Q.   And could you please read what that entry says.

3   A.   The top and the bottom portion?

4   Q.   Just the bottom portion.

5   A.

6        *You are learning stuff that you aren't supposed*

7        *to know about until you're older.  If anybody knew I*

8        *taught you this we would get in trouble because I'm*

9        *not something you -- it's not something you learn*

10       *until you're like 11 or 13.  So Rule No. 1 is, keep*

11       *it a secret.  Rule No. 2 is, use code names like*

12       *"meditate" and stuff like that.  Rule No. 3, when*

13       *texting, only use code names.  You can't say stuff*

14       *like "it went up"; otherwise, if your mom reads your*

15       *text, she will know.  Got it?*

16       *All right.  So you jacked off (or code name*

17       *"meditate") how many times so far?  How did it feel?*

18       *Does it make you want to keep going?  Nice!  All*

19       *right.  So remember, when you don't do long enough it*

20       *will do this thing called cumming.  Code name is*

21       *"breathe".  That's when it just took a moment when it*

22       *feels really, really super good, and then you stop*

23       *and it goes down.  It does a jumpy thing too called a*

24       *flex.  It looks like this (video).*

25       *Now let's talk about something called sex (code*

Direct - David Vucich

1    *name "meditate level 2"). Sex is when two people*

2    *help each other feel good for fun, like a boy and a*

3    *boy that are really good friends. It feels good to*

4    *hug, right? And when you're -- someone brushes your*

5    *hair and you brush theirs. Well, "meditation level*

6    *2" is when you do things like jack off with your*

7    *friend or you play jack off for them. You can do a*

8    *lot of other things too in sex. I make them feel*

9    *good. If you suck on it, it feels better. And the*

10   *best feeling, 1, is something we can talk about*

11   *later. So "meditation level 1" is when you jack off,*

12   *and "breathing" is when you cum. "Meditation level*

13   *2" is sex. Got it? We can work on "meditation level*

14   *2" really quick but we can't get too far with it*

15   *today.*

16       *First, watch this (comic). Now, real quick, are*

17   *you wearing underwear or boxers? Let me see? See if*

18   *you will go to the bathroom. Take a picture (side*

19   *angle dick and balls). Hide phone.*

20       *MS. SUMMERS:*  Thank you.  Government would move to

21   admit Exhibit 2.

22       *THE COURT:*  Any objection?

23       *MR. GABEL:*  No objections.

24       *THE COURT:*  Be admitted.

25       **(Government's Exhibit No. 2 admitted)**

Direct - David Vucich

1   *Q. (By Ms. Summers)*  In your analysis of the Defendant's phone,

2   did you find any evidence consistent with these code words such

3   as "meditate"?

4   *A.*  Yes.

5   *Q.*  What did you find?

6   *A.*  As far as the investigation, what he told us, or in

7   addition to --

8   *Q.*  What did you find on his phone that was consistent with

9   the use of these code words?

10   *A.*  There were text messages that were found on his phone

11   exchanged between the victims where he was specifically

12   citing to "meditate" and "breathe", and remember his

13   instructions basically is what the Defendant was

14   communicating with the victim.

15   *Q.*  And in particular, that was with regard to one of the

16   minors, correct?

17   *A.*  Yes.

18   *Q.*  Sometime after the Defendant was charged and detained in

19   this case, did you receive a letter that the Defendant had

20   sent while he was in the Clinton County jail?

21   *A.*  Yes.

22   *Q.*  And how did that come about?

23   *A.*  I was in communication with the Clinton County jail,

24   which is an authorized federal holding facility for inmates

25   awaiting sentencing or their trial dates, and contact with

Direct - David Vucich

 1  them was made to look at his phone calls and/or incoming,

 2  outgoing mail, and eventually we received a 35-page letter

 3  that was written by the Defendant.

 4  Q.  And you received that from the staff at the Clinton

 5  County jail?

 6  A.  Yes, ma'am.

 7  Q.  And did you read that letter?

 8  A.  Yes, I did.

 9  Q.  I'm going to show you -- let me show you what's been

10  marked as Government's Exhibit 3.  What is that?

11  A.  This appears to be a 35-page handwritten letter by the

12  Defendant, Christopher Horton.

13  Q.  Is that the letter that you received?

14  A.  It appears to be, yes.

15  Q.  And what is -- who is that letter addressed to?

16  A.  "Dear Friends, Family, Readers".

17  Q.  And I'm just going to call your attention to page 19 of

18  that letter.  Could you please read for the Court the

19  highlighted section.

20  A.  *I think I did what I did because I needed to see if I*

21  *could find myself.  I didn't know why or what made me the*

22  *way I was or am.  I needed someone like me to see if they*

23  *would grow to be like me one day.  My theory was, if they*

24  *were introduced to it at a certain age, would they too be*

25  *sexually confused?*

                    Direct - David Vucich

1          *MS. SUMMERS:*  Thank you.  I move to admit
2     Government's Exhibit 2.
3          *THE COURT:*  Any objection?  Three you mean?
4          *MS. SUMMERS:*  I'm sorry.  Exhibit 3, right.
5          *MR. GABEL:*  No objection.
6          *THE COURT:*  Admitted.
7     **(Government's Exhibit No. 3 admitted)**
8     *Q. (By Ms. Summers)*  In this case were you made aware that the
9     Defendant makes an argument with regard to his likelihood of
10    recidivism in this case?
11    *A.*  Yes.
12    *Q.*  And as a result of that, did you obtain additional --
13    information from the Bureau of Prisons about the number of
14    sexually dangerous persons petitions that are filed in the
15    Bureau of Prisons?
16    *A.*  Yes.  I received a chart, basically a statistical chart.
17    Certification Review Branch Report is what I'll refer to it
18    as.
19    *Q.*  And you received that from legal counsel from the
20    Legislative and Correctional Issues branch of the Bureau of
21    Prisons?
22    *A.*  I believe it was generated by Noreen Ahmed, and
23    eventually the report came to me, yes.
24    *Q.*  I'm going to show you what's been marked as Government's
25    Exhibit 5.  Could you tell me what that is?

                        Direct - David Vucich

1   A.   Appears to be a printout of the -- I'll refer to it as a

2   chart, a statistical chart, from the Certification Review

3   Branch Reports, which was updated on March 1st of 2014.

4   Q.   And according to that report, since October 2007, how

5   many sexually dangerous persons petitions have been

6   reviewed?

7   A.   46,137.

8   Q.   According to that report, of those cases reviewed, how

9   many have been actually certified for commitment?

10  A.   52.

11       MS. SUMMERS:   I have no further questions,

12  Your Honor.

13       THE COURT:   Cross?

**CROSS-EXAMINATION**

**QUESTIONS BY MR. GABEL:**

16  Q.   The Certification Review Branch Report, of the numbers

17  of cases, 46,137, you know what type cases they are?

18  A.   The chart doesn't go into that much detail as far as

19  what type of cases.

20  Q.   So you don't know if they were actual cases where

21  individuals were involved -- I mean touching was involved,

22  or what was involved there, do you?

23  A.   Well, there's 46,000 cases, so it would be a daunting

24  task, I think, to figure out each case individually, so my

25  answer's no.

Cross - David Vucich

1   Q.  That means, I think, that you don't know?

2   A.  Yes, that's correct.

3   Q.  Okay.  So you don't have any idea what type cases these

4   are, do you?

5   A.  No.

6   Q.  So you have a chart that you don't really understand, do

7   you?  All you know is 52 people were put in some sort of

8   program at the end of their sentence?

9   A.  That's what the chart indicates, yes.

10  Q.  Okay.  When you spoke to my client after his arrest, he

11  admitted what he did, didn't he?

12  A.  Not fully, no, he did not.

13  Q.  Well, he told you all and you all recorded everything,

14  didn't you?

15  A.  Yes.

16  Q.  And you talked about segmented videos.

17  A.  Yes.

18  Q.  Segmented video is an incident, put it like that, cut

19  into segments.  So it's one time period, is that the way it

20  works?

21  A.  Sometimes, yes.

22  Q.  Is that what you -- from what I believe you testified

23  to, that there were segmented videos that you saw, portions

24  of the incident in one video then continued on in another

25  video?

Cross - David Vucich

1  A.  Yes, sir, that's correct.

2  Q.  Okay.  So it it was was not -- I forgot the number now.

3  How many segmented videos were there?

4  A.  Are you referring to just what we found on the I-Phone

5  or the computer?

6  Q.  Let's talk about the I-Phone.

7  A.  Okay.

8  Q.  How many?

9  A.  Conservatively speaking, it was probably closer to a

10  hundred.

11  Q.  And of which, one incident would have been segmented

12  into numerous sections?

13  A.  That's fair to say, yes.

14        MR. GABEL:  Okay.  And the -- that's enough.  Thank

15  you very much.

16        THE COURT:  Redirect?

17        MS. SUMMERS:  No, Your Honor.  Thank you.

18        THE COURT:  Thanks.  You can step down.  Next

19  witness.

20        MS. SUMMERS:  I don't have any further witnesses,

21  Your Honor.  The victims' families have asked to be heard in

22  this case by way of my reading of the victim impact

23  statements with regard to Victims 1, 2 -- or Minors 1, 2,

24  and 3.  The father of Minor 4 would like to read their

25  statement.

1              THE COURT:  Okay.  This would be the time to do

2    that.

3              MS. SUMMERS:  Victim impact statement from the

4    mother of Minor 1:

5              Judge Herndon:  We have been asked to address

6         the Court on how this incident has affected us.  I

7         cannot even begin to imagine -- to express in simple

8         terms or words how the actions of Christopher Horton

9         have destroyed my family and the illusion of goodness

10        and decency that I have always believed in and hoped

11        for in humankind.

12             My son is but a mere 10 years old.  The only

13        things he should be worried about at this age are

14        scars, scrapes, or bruises from a fall after a bike

15        ride, not emotional scars that may never heal from

16        the monsterous things that were done to him by this

17        man.

18             My son looked up to Chris, in effect trusting

19        Chris both with his well-being and his innocence.  I

20        trusted Chris.  Many, many people trusted Chris.

21        Chris was an up and coming member of a close-knit

22        karate community an we all as a group entrusted our

23        children to Chris to teach and uphold the meanings of

24        integrity, loyalty, and honesty.  We considered Chris

25        a friend, in essence, an extension of our family.  To

1   *hold someone in that regard and to then find out that*

2   *everything you hold dear has been a lie, a ruse, a*

3   *deception, is beyond something that we can -- we are*

4   *able to comprehend, beyond something that we want to*

5   *think about as reality.*

6      *We, as a family, are sickened, horrified, and*

7   *broken that we will -- that we allowed our son to*

8   *spend any amount of time with Chris. We feel guilty*

9   *that we did not see any signs of molestation and*

10  *manipulation. We are mortified that we didn't*

11  *protect our son. We now have a 10-year-old boy that*

12  *we are not equipped to deal with, so we had to begin*

13  *counseling sessions with a child therapist.*

14     *There are days when our son is angry and*

15  *unresponsive and we can't reach him. We often walk*

16  *on eggshells, unsure of what he is thinking and*

17  *feeling. Is he reliving the nightmare daily? Is he*

18  *wondering that he's going to be in trouble for the*

19  *things that have happened to him? Is he scared every*

20  *day of his life? Will he ever be able to trust an*

21  *adult ever again? Does he blame us as his parents*

22  *for what happened to him?*

23     *The torture that he must have endured is almost*

24  *too much for us to bear some days, and I, as a*

25  *mother, cry many, many tears and spend many sleepless*

1     *nights wondering if we can make it through another*

2     *day.  I can't eat as I should most days, as the*

3     *stress and worry are far more -- foremost in my mind*

4     *and consume my every waking thought.  We had to*

5     *endure newspaper articles that talk of Chris and his*

6     *actions, and as members of the dojo, we are often*

7     *asked if we know who the victims are and if we know*

8     *any details of the incident.  It's difficult to*

9     *maintain a normal life and keep things normal for our*

10    *son when we have had investigators calling and family*

11    *members calling.  You never know if people are*

12    *looking at you funny because they have found out your*

13    *son was a victim or if they want to ask you if your*

14    *son was a victim or if they simply want to gossip.  I*

15    *don't want my son to be treated differently because*

16    *of what happened to him, but I fear that someone will*

17    *treat him differently.*

18        *My mother instincts tell me to shield my son*

19    *from everyone and everything but I know that's not*

20    *realistic.  We have to deal with what happened and we*

21    *have more -- we have to move on with our lives and*

22    *our future.  We are trying every day to be as normal*

23    *as we can.  I cannot let my son know that I am not*

24    *strong and cannot handle this.  I cannot let this*

25    *monster take my little boy from me.  And I will do*

1    *everything in my power to make sure that my son grows*

2    *up to be a sweet, caring, trusting, loving -- or*

3    *kind, trusting individual.  I need my son to know*

4    *that there are good, honest, decent people out there.*

5    *I need him to know that not everyone is evil and*

6    *deceptive.*

7         *If I could address Chris face-to-face, it would*

8    *be extremely difficult to speak to him.  As the*

9    *mother of a victim of his actions, I want him to know*

10   *that I think that he is the worse type of criminal.*

11   *To be held in such highest esteem and to be a*

12   *representative of authority in children's lives, then*

13   *to betray the families' trusts and violate the*

14   *innocence of the children entrusted in his care.*

15   *It's really hard.  Because of Chris's actions, my son*

16   *has the deepest wounds to his heart and soul.  Even*

17   *though there are no visual wounds to see, it makes*

18   *the healing process so much harder.*

19        *Each day I awake and fight to see the light come*

20   *back into my son's eyes and have to struggle for a*

21   *sense of normal in my family.  I have so much anger*

22   *and disgust for Chris and the evilness he brought*

23   *upon my family.  I need him to know that I cannot*

24   *condone his behavior.  I want him to know that he*

25   *deserves to be placed somewhere where he can no*

1    *longer do harm to other children.  He needs to*

2    *understand that there are laws that protect children,*

3    *and by breaking those laws, he must pay the penalty.*

4    *And so I ask that you do not show this monster any*

5    *mercy, for he did not have any mercy on my son when*

6    *he did those horrible things to him.*

7         Impact statement from the father of Minor 1:

8         *Honorable Judge:  The actions of Mr. Horton have*

9    *had a tremendous impact on my life, to my life, the*

10   *lives of my entire family.*

11        *Since Mr. Horton committed these crimes against*

12   *my young, innocent son, he has had to endure all*

13   *manners of disruptions to his life, privacy and*

14   *personal humility.  He has to undergo invasive -- he*

15   *had to undergo invasive medical exams, had to openly*

16   *discuss his experiences with unfamiliar persons about*

17   *what Mr. Horton physically and mentally did to him.*

18   *He's had to deal with feelings and horrors neither a*

19   *child or anyone should have to experience.  My son's*

20   *innocence and trust in others have been destroyed.*

21   *My family's trust of others, even of persons society*

22   *tells us each to trust, has been destroyed due to*

23   *matters complicated by Mr. Horton's terrible crimes.*

24        *We've had a very difficult time with our*

25   *daughter, who was also betrayed by Mr. Horton.  She*

1      *believed she was in a dating relationship with him.*

2      *As a former U.S. Olympic karate team member, we*

3      *entrusted Mr. Horton with our son.  Mr. Horton asked*

4      *for our son to accompany our daughter to his home*

5      *under the guise he'd provide additional competition*

6      *training, karate training, for our son.  He used*

7      *these opportunities, which came at the expense of our*

8      *daughter, to isolate our son and commit his heinous*

9      *crimes.  Our daughter was in complete denial of the*

10     *activities of Mr. Horton -- that Mr. Horton is*

11     *accused of, thinking she kept her younger brother*

12     *safe.  She has borne a large portion of the personal*

13     *blame, though she's in no way at fault for what*

14     *happened.*

15     *A monster will find any way to get to their*

16     *victims.  We know this.  It took a lot of*

17     *professional counseling for our daughter to*

18     *understand this.  She continues to bear personal*

19     *wounds of betrayal and the grief of what her little*

20     *brother had to endure under her care and*

21     *responsibility, and a lack of trust in others.  The*

22     *financial impact on this crime -- on our family is*

23     *difficult to calculate.  I am active duty Air Force.*

24     *We have insurance that covers all medical and*

25     *psychological expenses; however, I retire within the*

 1          *next year and will have to pay for any future*

 2          *psychological needs.  Other, albeit limited, expenses*

 3          *have been travel costs to court proceedings and*

 4          *medical, psychological appointments.*

 5              *The personal emotional impact and stresses I've*

 6          *felt and have had to work through have had a grave*

 7          *and negative impact on me both personally and*

 8          *professionally.  I suffer from a very rare nerve*

 9          *disease which is affected greatly by stress.  Due to*

10          *the substantially increased family stressors I*

11          *endured since Mr. Horton's arrest, I've had to seek*

12          *additional medical treatment for the pain associated*

13          *with this disease.  Also, I've not been able to*

14          *complete full work days on numerous occasions due to*

15          *massive increase in pain.  This has an additional*

16          *impact on my work center, my unit's mission, and*

17          *Scott Air Force Base mission overall since I am a*

18          *one-deep position.  I am in a one-deep position which*

19          *currently only I can fulfill.*

20              *I never liked Mr. Horton.  There was always*

21          *something about him.  I don't know if it stemmed from*

22          *a parent's instinct, a former law enforcement*

23          *officer's intuition, or reading vague signs about*

24          *Mr. Horton, but had not pointed an accusing finger.*

25          *Some of these signs were as follows:  I had*

*intercepted a phone conversation between Mr. Horton*

*and my son and demanded from Mr. Horton the reason he*

*felt he needed to have contact with my son outside of*

*karate school.  He'd fall all over himself trying to*

*come up with an excuse.  I fought tooth and nail with*

*my family over my daughter dating Mr. Horton and my*

*son going to his home.  It wasn't right.  It wasn't a*

*professional relationship.  I can see the fear in his*

*eyes when he'd look at me.  I'd hear the fear in his*

*voice when he spoke to me.  When he'd conduct private*

*lessons at the school with my son he constantly*

*looked out the small window to see where people were.*

*Hindsight being 20/20, I realize now why he had those*

*fears.  He was fearful of me, my family, of anyone*

*finding out what he was doing.*

*I believe Mr. Horton needs to spend the rest of*

*his natural life in prison for his crimes.  He has*

*made it known that he knew what he was doing was*

*wrong.  He does not show any remorse for his actions.*

*He stated in open letter that if he was let free,*

*would continue to commit these crimes.  Facing the*

*consequences of his actions, one would assume take*

*measures to insure he was never caught, at least not*

*in the same manner in which his crimes were*

*discovered in February -- discovered in*

1    *February 2013.  He has committed felonies, and in*

2    *doing so, taking the innocence of children, hurt*

3    *families, squashed previously held goals, selfishly*

4    *harmed the bright reputation of local business*

5    *leaders, and it's time he be held accountable for his*

6    *actions with the most stern sentence within your*

7    *power to levy, far away from his family, who, while*

8    *knowing what he's done, continue to allow him to be*

9    *with my son.*

10    *Thank you for your time and consideration of the*

11    *impact Christopher Horton's crimes have had on me and*

12    *my family.*

13    Victim impact statement from the mother of Minor 2:

14    *Thank you for letting my statement be heard.*

15    *It's a long statement and hopefully it will cause*

16    *strong awareness of the horrible realities of sexual*

17    *assault and the repercussions of rape that my family,*

18    *especially my son, continues to experience.*

19    *I would like to thank the police and attorneys*

20    *the state officials, courts, child advocacy, and each*

21    *person who had a hand in putting Christopher Horton*

22    *behind bars and who helped my son and my family*

23    *during this awful time.*

24    *As a result of my son's vicious assaults, we*

25    *have uprooted our lives in an effort to find some*

1    *kind of safe, sane life for our family.  My husband*

2    *is in the military and his job at present has taken*

3    *him away from us for several months.  Because I could*

4    *no longer face living in Illinois without him as a*

5    *daily moral support, my three children and I have*

6    *moved several states away in order to live*

7    *temporarily with family.  The move means a great*

8    *sacrifice and time with my husband and having the*

9    *money to move and live in a different state.*

10   *My son had just turned six years old when he was*

11   *sexually assaulted and raped multiple times by*

12   *Christopher Horton.  Horton groomed my son not to*

13   *speak of the assault.  My son told me he was scared*

14   *and confused as to why his sensei would promise him a*

15   *Nintendo 3-DS if he let him touch his privates and do*

16   *other stuff to him.  He said it felt wrong but he --*

17   *but was too afraid to talk.*

18   *His fears manifested as nightmares, screaming,*

19   *panting, trembling, and violent nightmares starting*

20   *during the summer of his assaults.  They continue to*

21   *this day and he loses much needed sleep.  He's so*

22   *exhausted that he fell asleep in school.  My bright,*

23   *smart son struggles now with school work and his*

24   *grades continually suffer.  The summer our son*

25   *started having trouble using -- that summer our son*

1    *started having trouble using the bathroom.  Bowel*

2    *movements were and still are the cause of much*

3    *physical pain, and times of extreme stress he will*

4    *have bowel movements in his underwear.  His therapist*

5    *told us these things are normal for a rape victim.*

6    *Because of the assault, we do not allow our son to be*

7    *involved in any extracurricular activities.  I*

8    *begrudgingly let him go to school.  I had to tell his*

9    *teachers in Illinois and have to tell his new teacher*

10   *about his past abuse just in case he decides to talk*

11   *about it.  It's excrutiatingly painful to recount*

12   *what happened, and embarrassing for my child.  I will*

13   *have to do this with every new school he attends.*

14       *My son is not adjusting well to this move from*

15   *Illinois.  He cries almost every day.  He has been*

16   *forced to go to a new school and is bullied because*

17   *he is too shy and sensitive.  He misses his dad*

18   *terribly.  My three-year-old daughter is having an*

19   *extremely difficult time moving from the home and*

20   *routines and friends she knew in Illinois.*

21       *In my hours of internet research trying to find*

22   *information on how to help my son and my family deal*

23   *with this horrible situation, I stumbled upon the*

24   *website of a Christian writer, John Shore.  He*

25   *writes:  "The real crime of sexual abuse isn't*

physical; it's psychological, emotional, spiritual.
You make someone despise who they are sexually, which
is at the very core of the identity of all of us, and
you've created damage that easily lasts for
generations."

Psychologists have indicated that my child will
never be rid of the demons that come from being
sexually abused.  Those demons will probably torment
him forever.  As for me, I am a woman of faith, but I
have been very angry with my God.  I have questioned
him.  I have yelled and begged for an answer as to
why my child was a victim.  Why would he let
something like this happen?  The answer is simple:
He did not allow this.  He gave us each free will.
We use free will to make our choices but our choices
are not free from consequences.  Mark 9:42 tells us:
"Whoever causes one of these little ones who believed
stumble, it would be better for him if, with a heavy
millstone hung around his neck, he had been cast into
the sea."  For me this means the person who causes
simple harm to children should be punished by death.

I believe that Christopher Horton's prison
sentence will be his millstone.  Your Honor, I am
asking the maximum prison time be handed down to him
for his devious crimes against my son.  If he's not

1        *in prison for the rest of his life, I strongly*

2        *believe that he will rape the innocent again and*

3        *again.  Maybe even now the only regret he has is*

4        *being caught.  Because of his vile actions and*

5        *continuous rape of my son that summer, it's obvious*

6        *that he took sick pleasure in manipulating my son's*

7        *trust in him.  Nothing will give innocence back to my*

8        *son, which makes me justified in saying that I hope*

9        *Christopher Horton spends the rest of his life in*

10       *prison away from young boys.  I selfishly hope every*

11       *single day he is treated as nicely as he treated our*

12       *children.*

13          *Horton is a young man but my belief is that his*

14       *age should not be a consideration in his sentencing.*

15       *I believe he deliberately placed himself in a job*

16       *which allowed him to satisfy his perverted desires*

17       *with my son.  Ironically, he did not practice the*

18       *self-control he taught to students as a karate*

19       *instructor.  The only way to keep vulnerable boys*

20       *safe from his monstrous actions is to keep him locked*

21       *up until the day he dies.  Then my God can deal with*

22       *him.*

23          *As a mother of a young rape victim, I fight*

24       *depression every day, so for the sake of my children*

25       *I am taking antidepressants for the first time in my*

1    *life.  My medicine dosage continues to be raised*

2    *because right now I'm having a difficult time with*

3    *life.  Anxiety has caused me to fear what -- that he*

4    *will be kidnapped, raped, or murdered.  I have to*

5    *convince myself to go out in public with my children*

6    *but my anxiety and fear is always there.  Every day I*

7    *struggle with my fears and the choice to let them win*

8    *and stay locked away at home with my three young*

9    *children or push past them and try to go on with our*

10   *lives.*

11        *I've also struggled with my feelings about*

12   *forgiveness.  How can I be a woman of faith if I*

13   *cannot forgive?  How can I teach my son to have a*

14   *servant's heart if I do not have one?  After much*

15   *therapy and praying I have made a strong decision*

16   *which is not to forgive Christopher Horton today.  I*

17   *am not at peace with what happened.  I may never be.*

18   *I am still trying to pick up the shattered pieces and*

19   *put my son's and my family's life back together.  It*

20   *is not my place to forgive him.  That decision must*

21   *be made between him and his God.*

22        *I am closing my statements with  stories about*

23   *my son, my incredible strong boy.  Last year during*

24   *the beginning of the trials my son was drawing a*

25   *picture.  It was of a policeman chasing a bank*

1    *robber. I asked him why he drew that. He said he*

2    *wanted to grow up to be a police officer so he can*

3    *catch all the bad guys. A glimmer of hope in my*

4    *sadness.*

5        *My son is almost eight years old now. He uses*

6    *the words "joyful", "cool", and "funny" to describe*

7    *himself, but he also uses the words "scared" and*

8    *"anxious". He can clearly remember everything that*

9    *Christopher Horton did to him. He can recount the*

10   *details like it was yesterday. I had hoped that his*

11   *young age at the time of the assault would help him*

12   *to not remember as much but I am, unfortunately, very*

13   *wrong.*

14       *Before I started writing my statement I*

15   *explained to my son what I was doing and asked if he*

16   *had anything to add. He shrugged his shoulders and*

17   *looked down at the ground. Then I asked how long he*

18   *thinks Christopher Horton should go to jail for what*

19   *he did. He looked me right in the eyes and said,*

20   *with a strong and steady voice, "A hundred years."*

21       *I end my statement with the request of my son,*

22   *my boy who was assaulted and raped at just six years*

23   *old. Please hear my child's voice and keep*

24   *Christopher Horton in jail for as long as possible.*

25   *Perhaps a life sentence would be some kind of*

1    *justice.  It could never make up for what he did to*

2    *my son and to the other boys and their families but*

3    *knowing he will never prey on them again will give*

4    *some sense of security they deserve.*

5         Victim impact statement from the father of Minor 2:

6          *Christopher Horton's despicable acts against my*

7    *son forever changed the lives of an innocent child as*

8    *well as other children that are victims but have also*

9    *changed my entire family forever.  The effects of*

10   *Mr. Horton's crimes have profound effects on my son*

11   *already.  He wakes up in the night scared, yelling*

12   *for his mother and I, shaking in fear that he cannot*

13   *talk about what has frightened him.  He has been a*

14   *victim of horrible crimes yet the pain didn't end*

15   *there.  He has to continue to relive the pain*

16   *throughout being questioned at the child advocacy*

17   *center, undergoing embarrassing medical screenings*

18   *for signs of abuse and disease, and numerous therapy*

19   *sessions to attempt to help him understand and work*

20   *through the pain and mental scarring these horrible*

21   *acts of abuse had on him.  My son will never be the*

22   *same child again.  These acts will absolutely affect*

23   *his emotions, life choices, and personality for the*

24   *rest of his life.  My son's innocence and childhood*

25   *were stolen from him and they can never be returned.*

1    *That's something my family and I will never forgive.*

2    *While I vow to my son to do everything in my*

3    *power to insure he is as well-adjusted and as happy*

4    *as possible, I am not so sure that my wife or I will*

5    *ever fully heal.  I will never forget the agonizing*

6    *pain that I felt the day that I found out what*

7    *happened.  I will never forget the desire for death I*

8    *felt due to the overwhelming hurt I could not escape.*

9    *I cannot forget the months of nightmares I*

10   *experienced waking up through the night from the*

11   *intrusive thoughts permeating my dreams.  I wish I*

12   *could forgot the blood-curdling scream my son*

13   *bellowed as I was forced to physically restrain him*

14   *when needles entered his arm to test him for sexually*

15   *transmitted diseases.  These sort of things no parent*

16   *should have to go through, and unfortunately,*

17   *Mr. Horton chose to spread the pain of his actions to*

18   *multiple families that surely feel many of the same*

19   *agonizing emotions as my wife and I do.*

20   *These crimes have changed me from the person I*

21   *used to be.  I am unable to trust anyone other than*

22   *the closest members of my family.  I am fearful to*

23   *allow any of my children to be left alone without my*

24   *wife or I present.  I live in constant worry that my*

25   *son will suddenly have flashbacks of the abuse to*

1    *which he was subjected.  There isn't a day that goes*

2    *by where the sadness and hurt in my heart flood my*

3    *mind and distract me from whatever I'm doing, whether*

4    *it's during work or leisure time.  When I look at my*

5    *son, whether it happens within a minute or after I've*

6    *been with him all day, sooner or later I think about*

7    *what he must have gone through and the pain he still*

8    *experiences.*

9        *No punishment the Court can bestow upon*

10   *Mr. Horton will ever right the wrongs he's done.*

11   *1,000 years in prison could not heal the hurt my*

12   *family feels.  There is a situation where -- this is*

13   *a situation where, no matter what the punishment is*

14   *given, it cannot fit the crime.  However, I*

15   *desperately implore the Court to give*

16   *Christopher Horton the maximum sentence possible, if*

17   *for no other reason than to serve as an example for*

18   *other pedophiles.*

19       *What has been done is done and nothing can take*

20   *it away.  We can only hope to heal at this point.*

21   *However, if the Court sees fit to hand down the*

22   *maximum sentence, perhaps it will have an effect on*

23   *others who may commit crimes against children.  If*

24   *only one child is saved from the devastating and*

25   *sickening acts that were committed against my son and*

1        *other victims of Christopher Horton, then a heavy*

2        *sentence will have done what it was meant to do:*

3        *Punish the one committing the crimes and persuading*

4        *others to never commit the same crimes.  I am*

5        *heartbroken by what my son and other children went*

6        *through, but please don't let their suffering be in*

7        *vain.  Let Mr. Horton serve as an example for why*

8        *children are not easy prey for pedophiles such as*

9        *himself, but that children are human beings with love*

10       *in their hearts and innocence that deserves*

11       *protection.*

12               Victim impact statement from the mother and father

13   of Minor 3:

14           *Honorable Judge Herndon:  I put off writing this*

15       *letter for a long time because I don't and never will*

16       *have the words the even begin to express the impact*

17       *that Christopher Horton and his actions have had on*

18       *my son, myself, my family, and all those who are*

19       *close to us.  I guess I should start with my son, who*

20       *was six at the time Chris Horton molested him.*

21           *In my line of work, teaching martial arts, I*

22       *have met and worked closely with literally thousands*

23       *of kids over the last twenty years, every one of them*

24       *unique and special in their own way.  From that*

25       *perspective, I have to say my youngest son is truly a*

1     *special child.  He is a neat kid.  He is likeable and*

2     *friendly.  He gets along with everyone.  For his age*

3     *he demonstrates an amazing amount of common sense.*

4     *His kindergarten teacher described him as popular*

5     *with his peers.  "Popular" isn't a word I would*

6     *choose to use for a five-year-old, but she was*

7     *definitely correct.  Adults love him, his teachers*

8     *love him, other kids love him.  I am constantly told*

9     *by adults around me what a phenomenal and unique*

10    *child he is.  I know all parents think their kids are*

11    *special and gifted, as they should, but he truly is*

12    *something different and special.*

13         *Just a few weeks ago I had an adult going*

14    *through treatment for pancreatic cancer who asked me*

15    *to have my son pray for him because he knows that my*

16    *son is special and has a direct line to God.  This*

17    *man didn't ask me or my husband to pray for him; he*

18    *asked for my seven-year-old son to pray for him and*

19    *his recovery.  That says volumes about the way others*

20    *see him.*

21         *Since these incidents occurred, my son has had*

22    *terrible trouble sleeping at night.  He cries*

23    *unexpectedly.  He gets angry and frustrated over the*

24    *smallest tasks such as having trouble tying his shoes*

25    *or putting peanut butter on his toast in the morning.*

1   *He has had problems with his school work.  He is an*

2   *intelligent child, yet his reading is almost half a*

3   *year behind, and he has to work with a special tutor*

4   *at school four days a week.  He told the doctor that*

5   *sometimes in school he has trouble concentrating on*

6   *his work because he has flashbacks; doctor's terms,*

7   *not his.*

8   *Three of four nights a week he sleeps with me*

9   *because he is scared to be alone in his bedroom.  I*

10  *had hung a cross on the wall in his room and the next*

11  *day it was hung over the outside of the bedroom*

12  *doorknob.  When my mother, who lives with us, asked*

13  *him why, he said to keep the bad things out so he*

14  *could be safe.*

15  *He is scared and insecure now in a way that he*

16  *have never was before.  Our society takes away our*

17  *children's innocence far too early as it is.*

18  *Christopher Horton took away my son's innocence, his*

19  *security, and his peace.  He did so with a reckless*

20  *disregard for the impact it would have on the life of*

21  *a small child who had no control.  He was*

22  *premeditated, selfish, predatory, and brazen.  He was*

23  *in our home less than a week and did all of these*

24  *acts while they were -- while there were three other*

25  *adults in the house at the time.  One can only wonder*

1    *what he might have done with more time and no one*

2    *around to potentially walk in on him and catch him.*

3        *The emotional and physical impact this has had*

4    *on my husband and myself has been enormous.  We have*

5    *experienced a tremendous amount of emotional stress*

6    *from this situation.  I hold on to my stress*

7    *physically.  My body hurts.  I am tired all the time.*

8    *Up until recently I haven't been able to sleep at*

9    *night.  My husband and I both waited until we were*

10   *older to have kids because we wanted to make sure we*

11   *did it right.  Deliberate parenting.  We both came*

12   *from poor backgrounds and wanted to give our children*

13   *the attention, opportunities, security, and financial*

14   *support we didn't have as children.*

15       *Yes, emotionally I hurt for my son.  Every*

16   *parent hurts when their child hurts and they can do*

17   *nothing about it.  That helplessness to help has been*

18   *one of the most painful things but  I also hurt*

19   *because I feel like I failed as a parent, having --*

20   *after having lost my second child at birth, God gave*

21   *us this beautiful baby boy and he trusted us with his*

22   *care and upbringing, and I failed to protect him from*

23   *this monster.  Even worse, I'm still unable to figure*

24   *out how he made it happen in a house full of people.*

25   *Because of that, we don't receive guests in our home*

1    *any more.  I may never be able to control what*

2    *happens in the outside world but I can control what*

3    *happens within the walls of my home.  My kids should*

4    *always be allowed to feel safe in our home.  I failed*

5    *at this once and I will never fail at it again.*

6        *I am extremely distrustful of others.  I'm even*

7    *afraid to drop off my boys at church on Sunday*

8    *evenings for their youth group sessions.  I stay just*

9    *in case.  As for my husband, we just don't discuss*

10   *it.  It's too painful.  We simply try to provide a*

11   *supportive environment for our son, trust in God's*

12   *will, and hope for the best.  It doesn't remove our*

13   *anxiety though.  How do we know these pictures aren't*

14   *out on the internet somewhere for other perverts to*

15   *view, that they won't show up sometime in the future?*

16   *Knowing that sex imprinting happens during the first*

17   *three to five sexual experiences, how do we know that*

18   *he won't grow up to be the next Chris?  Will he*

19   *remember this or not?  How will it impact his*

20   *relationships as he gets older?  Will he trust*

21   *others?  Will he be able to have appropriate*

22   *relationships when he's older?  What does this look*

23   *like in 10, 20, 30 years?  What future heartbreaks do*

24   *we still have to live through because of what this*

25   *monster did to our son and other people's sons as*

1      *well?  Only God knows.*

2      *I know I'm supposed to talk about the financial*

3      *impact this has had on our family.  This point is*

4      *very far-reaching.  Yes, there are doctor bills and*

5      *gas expenses and the travel from Texas to Illinois to*

6      *attend the hearings, but this doesn't begin to*

7      *express the financial impact this has had on my*

8      *family.  Christopher Horton was never my martial arts*

9      *student or my employee and has never worked for my*

10     *martial arts studio, but my studio in Swansea is*

11     *being sued for his heinous act.  He was employed by*

12     *another studio that uses the same trademark as we do.*

13     *While most of my students and their families*

14     *have been very supportive during this very difficult*

15     *time, we have had many families leave because of it.*

16     *We also have had many other families that have not*

17     *signed up with us because they believe we are the*

18     *other studio.  That represents a huge financial loss.*

19     *My best estimate is that, over the next three to five*

20     *years, that represents nearly $500,000 in lost*

21     *revenue from those that left or did not join.  On top*

22     *of that, to my total dismay, though I have no*

23     *affiliation with Horton, one of the other victims'*

24     *families has decided to sue my studio.  Although I do*

25     *expect the suit to eventually be dismissed, until*

1     *that time I still have to pay for the attorney's fees*

2     *to defend myself.  So far I have a bill of around*

3     *$5,000 but fully expect, before this is done, for*

4     *that bill to exceed a hundred thousand.  And there is*

5     *still the potential lawsuit damages will exceed*

6     *1 million if granted.*

7          *Not only has my son been a victim but he*

8     *continues to be victimized as the situation drains my*

9     *finances and takes my time and energy away from him.*

10    *This is money that should be going towards his*

11    *college education, his life experiences, his future.*

12    *We had a year-long R V trip planned for his third*

13    *grade year.  I was going to home school both my boys*

14    *next year and take the entire year traveling around*

15    *the United States as a family so my boys could*

16    *experience this wonderful country that we live in*

17    *firsthand instead of just reading about it in books.*

18    *We already had a complete plan, from Hollywood*

19    *Boulevard and the great redwoods on the west coat to*

20    *New England foilage and cherry blossoms in*

21    *Washington, DC on the east coast and everything in*

22    *between.  I wanted to let my kids experience this*

23    *country firsthand so they have a reason to love,*

24    *respect, and support it, and a reason to fight for*

25    *the freedoms that we've been given.  This trip would*

1    *have impacted their entire lives and it will not*

2    *happen because I can no longer afford it.*

3        *So as I said, my son and my family have not only*

4    *been a victim once but continue to be victimized as*

5    *this lawsuit drains our finances and takes our*

6    *attention and energy away from the things that we*

7    *should be focused on the most, specifically my son.*

8    *The impact of all of this so far-reaching, I've*

9    *watched this event shake our entire community to its*

10   *core.*

11       *I've watched as my friend, Kevin, and his*

12   *family, who owns the other studio, have struggled*

13   *with losing their business and dealing with these*

14   *awful acts over which he had no oh control.  I've*

15   *taught martial arts for over 15 years.  I've helped*

16   *literally thousands of families solve problems with*

17   *their kids.  We've taken kids off the street and made*

18   *them productive.  We've taken productive kids and*

19   *gotten them the service academies, made them world*

20   *champion athletes, and gotten them scholarships to*

21   *college.*

22       *I spent my time and energy for last*

23   *decade-and-a-half protecting kids and families from*

24   *predators like Christopher.  If this could happen*

25   *under my own roof, it can happen anywhere.  None of*

 1          *our kids are safe without astounding vigilance.*

 2          *People like Christopher Horton cannot be reformed.*

 3          *This is part of who they are.  They cannot by cured*

 4          *and they will always hurt others.  Their personal*

 5          *satisfaction is far more important for them than any*

 6          *amount of pain they cause others.  That will never*

 7          *change.  You have the power to keep him from hurting*

 8          *others.  We ask that you pass a sentence that never*

 9          *allows him to leave prison so he can never hurt*

10          *anyone again.*

11          And the victim impact statement from the

12   grandmother of Minor 3:

13          *Honorable Judge Herndon:  As the grandmother of*

14          *one of the Defendant's victims, I want to make you*

15          *aware of just how far-reaching the impact of his*

16          *premeditated, calculated, and heinous acts have been.*

17          *Not only have our children and grandchildren been*

18          *victimized, but like the ripple of a pebble in a pond*

19          *spreading outwards, so too have both the immediate*

20          *and extended families of his victims been victimized.*

21          *Since my grandson was molested at age six, I*

22          *have watched my family struggle to come to grips with*

23          *what happened.  The emotional and financial tools --*

24          *tolls the sleepless nights, the feelings of*

25          *helplessness, guilt, anger, and sadness were and are*

1    at times overwhelming.  As a grandmother and mother,

2    this pain and anguish is compounded exponentially as

3    I try to deal with the life sentence without parole

4    that his actions handed out to, not only my grandson,

5    but my entire family.  I see the pain in my

6    daughter's eyes as she  struggles to deal with her

7    feelings of failure as a parent.  I watch my

8    son-in-law struggle with his feelings of guilt

9    because he was unable to keep his family safe in

10   their own home.  I watch my grandson in ways that are

11   not normal for an eight-year-old child because he

12   does not know any other way to deal with his pain.

13       Each time a new issue arises in this case these

14   painful wounds are reopened and the cycles of

15   emotions and pain start all over again.  Because I

16   share a home with the victim and his family, I often

17   struggle with my own feelings of guilt, failure, and

18   helplessness.  Daily watching my family struggle with

19   the emotional, physical, and financial burdens caused

20   by this monster's actions has caused me untold

21   anxiety and stress, resulting in dramatic mood

22   swings, bouts of uncontrollable crying, and angry

23   outbursts.

24       In addition, I find myself second-guessing

25   everyone's actions and intentions, and my ability to

1    *trust others has been shaken to its very core.  I*
2    *often sit in church and struggle with the concept of*
3    *forgiveness, knowing it is the Christian thing to do,*
4    *but find myself failing miserably, falling miserably*
5    *short of that goal.  Peace and contentment in my life*
6    *are just a distant memory, and I doubt things will*
7    *ever be the same again.  Even now, some two-plus*
8    *years later, I relive this nightmare on a daily basis*
9    *every time I look into the angelic face of a special*
10   *little man, my grandson, knowing his life was forever*
11   *changed when his innocence was stolen from him by a*
12   *monster disguised as a teacher and mentor.*
13        *The Defendant's unspeakable acts against his*
14   *victims and their families have caused emotional*
15   *scars that will never disappear.  No one knows what*
16   *the long-term effects of this monster's actions will*
17   *be for all the victims involved, but one thing is*
18   *certain:  All those affected can never go back to the*
19   *way things were before he forced himself upon them.*
20   *Once a pedophile, always a pedophile.  I do not*
21   *believe that he can be rehabilitated.  Like the*
22   *families he violated, he too should be sentenced to*
23   *life without the possibility of parole.  All this may*
24   *not be possible from a legal standpoint.  Because of*
25   *the nature and magnitude of his crimes, I am asking*

1        *that he be sentenced to the maximum time allowable by*

2        *law.  He should never be allowed to have access to*

3        *children again so that we may take some comfort in*

4        *knowing that he will never do this to another family.*

5              And then at this time the father of Minor 4 would

6        like to read his statement.

7              *THE COURT:*  You don't have to identify your name.

8        We know you as the father.  Thank you for being here.

9              *UNIDENTIFIED SPEAKER:*  Thank you.  You said I don't

10       have to identify my name?

11             *THE COURT:*  No.

12             *UNIDENTIFIED SPEAKER:*  Okay.

13             We remember the day our son was born like it was

14       yesterday.  We can close our eyes and vividly remember

15       staring at his little face, hands, ears.  He was the most

16       beautiful child that we had ever laid eyes upon.  We knew

17       from that very moment that we wanted to give him the world,

18       everything we never had, and nothing, absolutely nothing

19       would hurt him.  They would have to go through us first.  We

20       did everything we could to protect him, and yet our son

21       experienced something so devastating, so detrimental, so

22       destructive.  He had the displeasure of being a student of

23       Christopher Horton.

24             Our son is nine years old today.  He is an

25       extremely bright child.  Most of the time he is happy,

1    silly, fun-loving; other times he is troubled, angry, and

2    even aggressive.  Words cannot explain the hurt we --  or

3    our hearts feel when we see the pain and angst on our

4    child's face when he has had a rough day, when he is facing

5    demons that he should never have had to face.

6            In September of 2012, we began getting disturbing

7    calls and e-mails from our son's teacher at school.  He was

8    acting out inappropriately, being destructive and hurtful to

9    others.  This was not the sweet, honest, funny boy that we

10   had raised.  In a matter of a few short months our child had

11   drastically changed.  After some discussion with the school

12   staff we decided to seek outside counseling for him and for

13   ourselves as a family.  With costly biweekly and weekly

14   counseling sessions, we made huge strides within the next

15   five months.

16           Then when the news of Christopher Horton's arrest

17   was made public our hearts sank.  We realized what had

18   happened to our child.  We understood the angry, aggressive

19   behaviors.  Our child was hurt.  He had been hurt by someone

20   that we trusted, that he trusted, and that the community

21   trusted.  We have all been betrayed.  We have and will

22   continue to invest everything we possibly can in restoring

23   what was lost:  Our child's innocence, trust, and faith.  We

24   will exhaust every minute of every day making him better.

25   We will not rest until he has the help he needs to feel like

1   a kid again, to feel like he can trust again.

2          Our son will not talk about what happened still to

3   this day.  He occasionally will make statements like he will

4   not want to be in his room because he feels that someone is

5   viewing him changing or things like that.  And any time

6   anybody mentions or talks about karate or martial arts he

7   completely freezes up, won't talk, gets quiet and lonely,

8   and it tears us apart because he at one time loved karate,

9   and I did karate with him.  And it's just so hard for us to

10  see him go through this, that he will never be able to do

11  something that he loved ever again.

12         This crime has affected our son and our entire

13  family in so many ways, not just emotionally, but physically

14  and financially.  Today we ask the Court to impose the

15  maximum possible sentence for each and every count that he

16  has been charged with and pled guilty to.  Thank you.

17         *THE COURT:*  Thank you, sir.

18         Any other victim impact statements, Ms. Summers?

19         *MS. SUMMERS:*  No, Your Honor.

20         *THE COURT:*  So if you'll make your argument for the

21  sentence the Government feels appropriate.

22         *MS. SUMMERS:*  Four families' lives were forever

23  changed one year ago when they were told that their

24  children, ages 6, 6, 7, and 10, had been sexually abused by

25  a man that they had entrusted with the care of their

1    children, a man who their boys bowed to and called sensei.

2    And their worlds were even more rocked when they were told

3    that this man had recorded all of the instances of abuse of

4    their children and kept these recordings as trophies.

5            When we look at the nature and circumstances of

6    this offense, the offenses committed by the Defendant, I do

7    not know how we characterize it as anything short of a

8    parent's worst nightmare and a complete violation of

9    innocence of the most predatory nature.  The Defendant was a

10   black belt in martial arts instructor at a studio where he

11   was trusted with the instruction and supervision of young

12   children.  The Defendant exploited this position of trust to

13   very quickly, in a calculated and premeditated manner,

14   sexually abuse four young boys in less than one year of

15   working at that studio.  He recorded his repeated sexual

16   abuse of these children on his I-Phone and kept these

17   recordings as his collection.  Demonstrating brazen

18   arrogance, the Defendant committed these sexual abuse of

19   these children right under the noses of their parents and

20   other instructors.  The Defendant committed his abuse of

21   Minor 1 at the Defendant's home while others were present,

22   as well as at the martial arts studio.  He committed his

23   abuse of Minors 2 and 4 in the small observation room of the

24   martial arts studio with a full class of students and other

25   instructors just outside the door.  As the Court has heard

1     in the videos recorded in this small room of the studio, you

2     can actually hear the class going on in the background.

3     Other students, parents, instructors were right outside the

4     door.

5          And then the Defendant sexually abused Minor 3 at

6     his own home where he was trusted by the family to stay with

7     them in their home for a week.  He was able to get to these

8     kids within one week's time.  How was he able to get to

9     these children in one week's time?  Because he was their

10    sensei and because he had a calculated plan to exploit that

11    position.  To these young boys, "sensei" means something.

12    It means "teacher".  They are taught that this person is

13    deserving of their trust and their respect, a person that

14    they will bow to and look up to.  In a total betrayal of

15    that trust and respect that he was undeservedly given by

16    both the children and their parents, he intentionally

17    exploited their adoration of him using a plan that he had

18    meticulously scripted about what he would say to these young

19    boys to initiate and maintain his control over them.

20         I didn't ask the agent to read those notes to be

21    overly gratuitous.  I asked that he read these notes because

22    I think the details of those entries so clearly demonstrate

23    how methodical, calculated, and predatory the Defendant was

24    in his abuse of these four boys.  That's how he got to them

25    so quickly.  He was a sensei on a mission.  He is a master

1    of his crime, a black belt in the sexual assault of

2    children.

3          The fact that the Defendant committed actual and

4    repeated sexual abuse of these four young boys is pivotal in

5    the Court's consideration of the nature and circumstances of

6    this offense.  A person can commit the offense of production

7    of child pornography without laying a hand on a child.

8    There are cases of surreptitious filming in which the

9    producer secretly captures the unclothed genetalia of a

10   child or records the child in an act that he or she believed

11   to be a private act.  There are also those cases where the

12   producer employs a child to pose in a lascivious display of

13   the child's genitals without actually touching any part of

14   the child's body.  And then there are cases like this one

15   where the Defendant records himself engaging in the sexual

16   abuse of four children, involving repeated acts of oral

17   penetration and simulated anal penetration.

18         The Defendant is not merely a voyeur who is

19   satisfied by viewing exposed genetalia of young children.

20   He is a person who takes pleasure in his own hands-on

21   offense and abuse of very young children, and he derives

22   continued deviant satisfaction by reliving his victimization

23   of these children through repeated viewings of his collected

24   recordings.  The crimes committed by the Defendant in this

25   case epitomize the type of conduct that Congress had in mind

1    when they imposed the harsh penalties mandated for these

2    offenses.  His conduct is worthy of severe punishment, the

3    type of punishment authorized by Congress and recommended by

4    the United States Sentencing Commission in the calculated

5    guideline range in this case of life imprisonment.

6            The Government submits that the nature and

7    circumstances of this offense undoubtedly support the

8    sentence of imprisonment between 720 and 840 months,

9    followed by a period of lifetime supervised release.  The

10   statute requires the Court also consider the history and

11   characteristics of the Defendant.  According to what the

12   Defendant and his mother report in the PSR, and the

13   evaluation completed by Dr. Cuneo, as well as some of the

14   statements made in the letters submitted on behalf of the

15   Defendant, he's had a bad childhood filled with many

16   negative influences and experiences that can certainly give

17   some insight into how he became the person that he is now

18   and perhaps into why he repeatedly committed these terrible

19   crimes against these children.  Certainly the accounting of

20   some of what the Defendant experienced  and witnessed in his

21   childhood invokes sympathy, and one could argue, as the

22   defense counsel does, that the system failed Mr. Horton.

23   One thing we can be certain, whether it is that the system

24   failed Mr. Horton or it was any one or combination of any of

25   the experiences of abuses reported in the PSR, in

1   Dr. Cuneo's report, or whether it was something that we

2   don't even know about, something went terribly wrong.  And

3   while we can have sympathy for what the Defendant has been

4   through, what we are faced with today in this sentencing,

5   I'd submit, is who he is now and a realistic evaluation of

6   the danger that he presents to the public.

7        I respectfully submit that, as the Defendant stands

8   before you in this courtroom today, he is a man who is

9   deeply flawed and who demonstrates the personality and

10  character traits found in the most dangerous people in our

11  society.  He has demonstrated intelligence, premeditation,

12  charm, manipulation, pervasive dishonesty, a callous lack of

13  empathy, a need for stimulation from deviant behavior, and

14  predatory sexual conduct.  These traits are demonstrated in

15  his own words in both the letter he wrote from the jail

16  after his arrest as well as in his report to Dr. Cuneo about

17  the details of why he committed the abuse of these four

18  young boys.

19       In his 35-page letter, the Defendant, describing

20  himself as disturbingly manipulative and clever for a young

21  boy, purportedly seeks to understand and explain his

22  behavior, but the writing itself is explanatory.  He reveals

23  a lack of genuine remorse by focusing on explaining and,

24  therefore, justifying his conduct.  It reveals his sense of

25  entitlement.  As the Court heard through the testimony and

1    the letter that's been submitted, the Defendant wrote, "I

2    think I did what I did because I need to see if I could find

3    myself.  I didn't know why or what made me the way I was or

4    am.  I needed someone like me to see if they would grow to

5    be like me one day.  My theory was, if they were introduced

6    to it at a certain age, they too -- would they too we

7    sexually confused or share similar desires in the future?"

8            Even after his arrest, incarceration, the Defendant

9    is objectifying his victims.  He makes it clear that these

10   children were nothing more than objects for him to abuse in

11   some form of experiment to see how they would grow up after

12   having survived his sexual abuse.  His ability to objectify

13   his victims, I'd submit, demonstrates a character devoid of

14   any empathy or compassion for the harm that he has caused by

15   his actions.

16           Even in his report to Dr. Cuneo about the details

17   of why he committed these offenses against the victims, the

18   Defendant makes excuses for his conduct, placing the blame

19   on the victims themselves, saying either that it was the

20   child's idea in the first place or that it was something the

21   child did or said that left him with an inability to control

22   his impulses.  The Defendant is an incredibly dangerous

23   person, a person who must be confined and incapacitated for

24   as long as possible for protection of the public.

25           When the Court considers the need for the sentence

 1   to reflect the seriousness of the offense, to promote

 2   respect for the law, and to provide just punishment, I

 3   submit that justice cannot be achieved in this case unless

 4   the significance of the sentence is in proportion to the

 5   magnitude of the crime and the harm caused.  And I don't

 6   think that the magnitude of this crime can be overstated.

 7   This is more than a child pornography case.  With

 8   premeditation and calculation, the Defendant raped these

 9   four children of their childhood, their innocence, their

10   sense of security, and understanding of who they are.  These

11   children are damaged, perhaps forever.  These boys may very

12   well, with counseling and the support of their loving

13   families, be able to get back some of these securities in

14   life that everyone deserves, but they will have to fight and

15   struggle for it.

16           We cannot fully understand the long-term

17   ramifications of this crime.  Will these children ever learn

18   to trust again?  Will they blame themselves for their abuse?

19   Will it cause them to feel different and interfere with

20   their ability to form meaningful and personal relationships?

21   Will their educations be impacted by the psychological

22   trauma they've suffered?  The questions could go on and on.

23   The harm caused to these children is incalculable, and that

24   harm caused must also be understood alongside the anguish of

25   the parents who now carry the burden of knowing that they

1    placed their sons in harm's way.

2          We've heard from the victim impact statements the

3    indescribable grief that is suffered by the parents who, on

4    a daily basis, have the emotional torment of knowing how

5    their child was violated.  A minimum sentence for each count

6    of production of child pornography is 15 years.  The

7    Defendant's conduct in this case is far more egregious than

8    any conduct contemplated by the minimum sentence.  And the

9    Defendant committed these offenses repeatedly against four

10   separate victims.  A sentence of 15 years, to be served

11   consecutively, for each of these four victims is necessary

12   to provide just punishment for the harm the Defendant has

13   caused and the crimes that he's committed against these

14   children.  Therefore, the Government recommends a sentence

15   between 720 and 840 months.

16         When the Court considers the sentence, the need for

17   the sentence to afford adequate deterrence to criminal

18   conduct and to protect the public from future crimes of the

19   Defendant, on this point defense counsel argues that because

20   the Defendant -- because of the Defendant's age, he is more

21   likely to benefit from treatment than older, more sexually

22   fixed offenders.  Although conceding that we can never be

23   absolutely certain that a Defendant will not reoffend,

24   defense counsel argues that because of the Defendant's youth

25   and the fact that he will receive effective treatment while

```
 1    in prison, a sentence of 25 years is sufficient to serve the
 2    goals of deterrence and protection of the public from future
 3    crimes of the Defendant.  And to support this argument, the
 4    defense counsel contends that under the civil commitment
 5    laws, Mr. Horton will be evaluated at the end of his prison
 6    sentence and before he is released, and if he cannot be
 7    safely released into the community, he will not be.
 8              I would submit that the contention that the civil
 9    commitment laws give us any sense of assurance that a person
10    who is still a danger to the community will be identified
11    and not released is belied by the statistics of the
12    Certification Review Branch Report.  While I don't know all
13    of the details of what cases are presented for
14    certification, or what types of cases, as Mr. Gabel pointed
15    out, this report does indicate, does show that since the
16    beginning of the program in October of 2007, of the 46,137
17    cases reviewed for civil commitment, only 52 have been
18    actually certified and committed by the Court.  That's less
19    than .001 percent.  And we know that the rate of recidivism
20    of sex offenders who have been released from are prison is
21    definitely higher than .001 percent.  In the studies that I
22    have found in my research and studies issued by the
23    Department of Justice, I have found that recidivism of child
24    sex offenders can be -- has been reported anywhere from 5.3
25    to 9 percent.  I just don't think that the possibility of
```

1     civil commitment at some point in the future can give us any

2     assurances that a dangerous -- extremely dangerous sex

3     offender will be released into society one day.

4          The defense counsel also argues that because of his

5     age at the time of the commission of his offense there's no

6     reason to believe that Mr. Horton will continue to pose

7     significant risks to reoffend for the rest of his life and

8     that he has significant potential for rehabilitation for

9     treatment -- through treatment.  I submit that there is

10    simply nothing in the record before this Court to support

11    the Defendant's likelihood of rehabilitation.  In fact, I

12    think everything presented demonstrates quite the opposite.

13         In his evaluation of the Defendant, Dr. Cuneo

14    determined that the Defendant is at a high risk to reoffend.

15    In his report, he reaches his conclusion having used the MN

16    Sex Offender Screening Tool.  The MN Sex Offender Screening

17    Tool is a tool used to perform an actuarial evaluation on

18    sex offenders.  When you consider the population that's

19    being studied in the use of this tool, is by definition a

20    collection of sex offenders.  By the fact that the Defendant

21    is classified at a high risk means he is literally the worst

22    of the worst in terms of his risk of perpetrating future

23    crimes on the public.

24         And the facts of this case I think further

25    demonstrate that the Defendant is not likely to be

1  rehabilitated.  Perhaps we could be talking about treatment

2  or rehabilitation if we were talking about a person who

3  committed this offense one or even two times, but we're

4  talking about the Defendant who produced over 38 videos,

5  that's just 38 videos that the victim's face can be seen, of

6  his abuse of four young boys.  How do you rehabilitate a

7  person who, in such a calculated, meticulous betrayal,

8  exploited his position of trust to obtain access to his

9  victims, who then repeatedly sexually abused them?  How do

10 you rehabilitate a Defendant who is not merely the

11 voyeuristic producer but, rather, takes pleasure in his own

12 hands-on abuse of very young children and derives continued

13 deviant satisfaction by reliving his victimization of these

14 children.

15        The Government submits that, on these facts and the

16 character demonstrated by the Defendant, the likelihood of

17 rehabilitation is slim to none.  He has demonstrated,

18 through his conduct and through his own words, that he lacks

19 any empathy or compassion for the harm that he has caused

20 these children, making him a much greater risk to reoffend,

21 and I'd submit, an extreme danger to society.  For that

22 reason, I think that he is a person who must be confined and

23 incapacitated for as long as possible for protection of the

24 public.

25        The lengthy prison sentence that the Government

1   seeks will insure that if or when he is ever released, he

2   will be of such an advanced age that he will be at a much

3   lower risk to reoffend against children.  So the Government

4   recommends that the Court impose a sentence between -- of

5   imprisonment between 720 and 840 months, followed by a term

6   of lifetime supervised release.

7        *THE COURT:*  Thanks.  Mr. Gabel?

8        *MR. GABEL:*  Thank you, Your Honor.  I'm not going

9   to revisit Dr. Cuneo's report.  I will point out that

10  Dr. Cuneo points out in his report that my client would

11  benefit if he was provided treatment for both his

12  psychological and sexual difficulties.  Such treatment would

13  help lower his overall risk of reoffending.

14       We don't know where Mr. Horton's going to be in 25

15  years.  By that, I mean, we don't know where he's going to

16  be in treatment.  He may be able to be released, he may not

17  be.  This Certification Review Branch Report is totally

18  confusing because it shows only 20,000 people in custody and

19  shows 46,000 cases reviewed.  You don't know what type of

20  person was interviewed.  We don't know anything about this

21  piece of paper.  What we do know today, my client should not

22  be released.  No one debates that.

23       We know my client had a terrible terrible

24  childhood.  That does not excuse the evil and wicked deeds

25  he did.  When we try to decide what the punishment should

1    be, we need to look at the protection of the society and we

2    need to figure out how to provide the Defendant with the

3    needed medical, correctional treatment that's required.

4    He's going to get treatment while he's in, we both know

5    that.  The question is how good it's going to be and whether

6    or not at the end he's going to be someone that is going to

7    be released or not.

8          I am not asking for a small sentence.  25 years is

9    a long time for a man of Chris's age.  And he knows that

10   there's victims, real victims, and not just of his actions

11   that happened when he was at the karate studio or at the

12   house.  They're being revictimized even when they have to go

13   to a counselor and relive it, and he's responsible for that

14   and he understands that.  Your Honor, 25 years, knowing that

15   he's going to be looked at, and knowing if Dr. Cuneo was

16   looking at him today he would keep him locked up.  We are

17   better off with a punishment of that, the 25 years, knowing

18   that he's going to be evaluated before he's released.  He

19   may spend the rest of his life in prison with a 25-year

20   sentence if he doesn't respond to treatment.  And we also

21   know it's very difficult, once you're committed to one of

22   the sexual treatment units, to ever get out.

23         This is not a light sentence that you're giving him

24   if you give him 25 years.  There's a good possibility that

25   he'll never be released from prison.  But it's an

1    opportunity for him, if he takes it and responds to

2    treatment, to be out on the street when he's 50 years old or

3    less.  I think that's realistic.

4         Thank you, Your Honor.

5         THE COURT:  Thanks, Mr. Gabel.

6         So one of the letters that I did receive was a

7    letter actually from Mr. Horton, and I have read it and am

8    considering it.

9         Mr. Horton, I'm obligated by law to offer you to

10   make a statement to me.  You're welcome to step up and talk

11   to me before I make my decision.  Would you like to do that,

12   sir?

13        THE DEFENDANT:  Yes, sir.

14        THE COURT:  Why don't you approach the podium,

15   please.

16   **(Defendant approaches the podium)**

17        THE DEFENDANT:  Your Honor, I'm given this a lot of

18   thought and I pray every day and I can't apologize enough

19   for everything that I've done.  All of my actions, I can't

20   apologize enough to you , the victims, their families, my

21   family, the embarrassing acts that I've portrayed.  And I

22   thank my family and everybody here, and I thank Mrs. Summers

23   for excellently defending the victims, and I thank

24   Mr. Gabel, and I thank you, Your Honor, jurisprudence.  I'm

25   nervous right now.  I'm sorry.  That is all, Your Honor.

 1          *THE COURT:*  Okay.  Thanks, Mr. Horton.

 2          Ms. Summers, rebuttal remarks?

 3          *MS. SUMMERS:*  No, Your Honor.  Thank you.

 4          *THE COURT:*  Okay.

 5          I first want to say, because the record cannot

 6   reflect since we do not  visually record court hearings,

 7   that this courtroom is absolutely filled with people.  Have

 8   quite a number of people that are here, I presume

 9   representing the victims in some way or another, and we have

10   quite a lot of people here representing and in support of

11   the Defendant.  I do not want to suggest or pretend in any

12   way that a case like this presents a judge like me with

13   anything but a very, very difficult task.  There are a lot

14   of things to consider.  There are a lot of things to think

15   about.  It's a very heavy weight that I bear as I analyze

16   this case.

17          Certainly the Defendant has not suggested anything

18   but a sizeable period of incarceration, and those

19   representing the victims have certainly suggested an

20   enormous amount of time they believe the victim -- the

21   Defendant, rather, should serve, whether it's something

22   between 720 months and 840 months or the Defendant's life.

23   So the parameters are certainly very substantial and the

24   obligation on me weighs quite heavily on what I'm to do, and

25   the only appropriate way to do it is simply analyze it under

1    the law and do what I believe is correct under the law, as I

2    do in every other case.   Perhaps  in a case such as this,

3    the task before us is just a little bit more difficult than

4    normal.

5          But looking at the nature and circumstances of the

6    offense, I believe, as a society -- this is borne out by the

7    criminal statutes -- we reserve some of our heaviest

8    protection for children, particularly when it comes to sex

9    offenses.   Some of the most harshest of penalties are in

10   this area.   That's very simply no question about that.   I

11   don't think anyone would argue that there's anything wrong

12   with that.   One simply needs to listen to the victim impact

13   statements in this case to understand why we do that.   They

14   are typically among the most vulnerable in our society and

15   they are subject to the most harm when something of this

16   nature comes along, and they suffer the greatest, their

17   families along with them.

18         And so as a result of that, the statutes provide

19   some of the most harshest of penalties, and as we see in a

20   case like this, the Sentencing Commission, in giving advice

21   to me, the advice was simply off the chart, and so we see

22   just how serious our society is in protecting our children.

23         This particular case was no different.   This is

24   probably, in my 15 years as a federal judge, one of the most

25   serious and heinous cases I've seen, and so it's one that,

1    when we consider the factor of nature and circumstances of

2    the offense, like when we were going through the technical

3    aspects of the guidelines, it is simply off the chart.

4    Most, most serious case.

5              History and characteristics of the Defendant.  In

6    reading the victim impact statements and knowing what the

7    victims have gone through, as I said, what the victims have

8    suffered is just immeasurable, but we see the history and

9    characteristics of the Defendant.  The Defendant's life

10   prior to his commitment of this crime is likewise

11   immeasurable.  Mr. Gabel has talked about this extensively

12   in his sentencing memorandum.  The letters that I received

13   from different people in Mr. Horton's family were quite

14   interesting to say the least.  People related to the

15   Defendant's mother blame the Defendant's father.  People

16   related to the Defendant's father blame the Defendant's

17   mother.  And doesn't matter to me who's to blame.  It's

18   clear that the Defendant did not have a normal upbringing.

19   There's no question he was subjected to some sort of sexual

20   abuse somewhere along the line at a young age.  What's

21   not -- there is -- there was one episode that was certainly

22   known, episode at school.  What is not known for sure is

23   whether there were other episodes, whether there was family

24   involved or not.  I don't know.

25              What we do know is that the Defendant has --

 1   Defendant's life has been characterized by sexual deviancy
 2   for a very, very long time.  Now, that certainly is a
 3   mitigating factor, and how much that inures to the
 4   Defendant's benefit is a difficult issue for the Court in
 5   light of the extremely serious nature of this crime.  And
 6   also the statement that the Defendant made in his letter
 7   that one of the reasons why he did this was to seek out
 8   people that he could see if they were like him and see if
 9   they would grow to be like him one day.  Ms. Summers used
10   the phrase "an experiment", and it is horrifying to think
11   that somebody would use little children as though they were
12   some sort of petri dishes or test tubes to see if they could
13   turn out to be like him because of what he went through,
14   knowing his terrible background.  And that is, as
15   Ms. Summers suggested and argued, an indication that the
16   Defendant is a very dangerous person.  And dangerous, I
17   would suggest, like the guideline computation, off the
18   chart.
19            So the Defendant's history and characteristics
20   weigh heavily, heavily against him in this analysis.  The
21   defense provides the Court with Dr. Cuneo's examination, and
22   he essentially confirms all this about the Defendant in
23   terms of his background.  Diagnoses the Defendant as a
24   pedophiliac; diagnoses him with being sexually attracted to
25   males; diagnosis him as having attention deficit hyperactive

1  disorder, combined type; personality disorder as well.

2  Further opined that the Defendant has no real concept of

3  what is appropriate sexuality, has no concept of limits, has

4  no concept with his own sexuality.  Went on to talk about

5  his early sexuality, and opines that the sexually abused is

6  now the sexual abuser.  Clearly also opined that he would

7  benefit from therapy in an effort to assist in his -- as the

8  doctor said, could help lower his overall risk of future

9  reoffending.

10      As Mr. Gabel said in his remarks, we know that,

11  according to the sexual offenders management program in the

12  Bureau of Prisons, he will get treatment.  Mr. Gabel said we

13  don't know what that treatment will consist of.  We don't.

14  We know he'll get treatment.  A lot of it will depend on his

15  cooperation and his voluntary -- the voluntary nature of his

16  desire to be seek treatment, as is always the case when

17  you're in the Bureau of Prisons.

18      Mr. Gabel suggests that the best protection for

19  society is that at the end of a 25-year period we depend on

20  the Department of Justice's program of civil commitment,

21  they will -- they're best positioned to determine  his

22  sexual dangerousness at that time, and we should depend on

23  them to then confine him, and understand that they will

24  confine him for the rest of his life if he is a sexually

25  dangerous person at that point in time, and that as we sit

1    here in 2014, that we can be certain that that is something

2    that this Court can rely on as well as society in general.

3          The Court must fashion a sentence that demonstrates

4    that the Court has considered that sentence to reflect the

5    seriousness of the offense, promote respect for the law, and

6    provide just punishment, as well as affording adequate

7    deterrence to criminal conduct, and protects the public from

8    further crimes, as well as, Mr. Gabel said, provided the

9    correct proper medical care and correctional treatment in

10   the most effective manner.  Mr. Gabel, as I mentioned,

11   believes that sentence is 25 years for a person that is now

12   21 and who has committed these offenses.

13          I didn't talk, when I was talking about the nature

14   and circumstances of the offense, that this is an offense

15   that -- these are offenses that involve three and four

16   victims that were repeated over and over and over again.

17   One of the unfortunate images that I have in my mind from

18   looking at the DVD is the very first one that's on the DVD

19   where the very young child is trying to resist Mr. Horton

20   and going back, and Mr. Horton is drawing him in, and

21   there's resistance and pulling back and resistance.  So

22   while it's true that Mr. Horton had a philosophical

23   influence over these children, as they trusted him as their

24   sensei, it wasn't complete in the sense that at least in

25   that one episode he had to keep pulling the child back in as

1    the child kept saying, *I just want to take my shower.  I*
2    *don't want this.*  And he kept trying to resist, and
3    Mr. Horton wouldn't let him.  Pulled him back as he
4    committed a sexual act on him.

5         And then we know that from the officer's testimony
6    that even though out of the, he said probably 100, that
7    there were 80 some videos.  And Mr. Gabel pointed out in
8    cross-examination that those were -- some of those were
9    snippets so that you have a little piece of video and then
10   it would be turned off and then another snippet of video, so
11   that it didn't represent that many actual sexual acts; but
12   many, many sexual acts, dozens, if you will, on these
13   children.  And you see in the video where Mr. Horton is in
14   that room in the dojo and he is committing sex acts on these
15   children and he's looking back to see if anybody's coming
16   and he's about to get caught.  So the dangerousness, the
17   deviousness, the predatory nature of these acts is once
18   again, to use the term I've already used, off the charts.

19        So when you consider -- and I think about other
20   cases I've had.  Ms. Summers used these analogies as well.
21   When you compare other cases that we typically have around
22   here, the typical case for us is not exploitation.  All too
23   often frankly have cases involving simple child pornography,
24   if that's not an oxymoron, and I compare this to some of the
25   other sentences that I've handed down when we want to talk

1    about the concept of avoiding unwarranted sentencing

2    disparities and talk about proportionality.

3            And when I look at this factor of the need for the

4    sentence imposed to reflect the seriousness of the offense,

5    promote respect for the law, provide just punishment, I

6    think about all the letters that I read, I think about the

7    arguments Mr. Gabel made, the arguments Ms. Summers made,

8    even considering the fact that the Commission has

9    recommended life.  Ms. Summers talks about 720 to 840

10   months.  Mr. Gabel talks about 25 years.  Given the

11   seriousness of this offense, the type of background

12   Mr. Horton had before he got to the point where he wanted to

13   see what would happen if he did those things to those

14   children to see if they would come out like he turned out, I

15   believe the just punishment in this case would be as

16   follows -- I'm not formally imposing sentence because I'm

17   going to do that after I tell you what sentence I'm going to

18   impose:  360 months on Counts 1 and 2; 360 months on

19   Counts 3 and 4; 360 months on Count 5, all those terms to

20   run consecutive; 360 months on Count 6, that term to be

21   concurrent.  And if my math is correct, total 1,080 months.

22   Lifetime of supervised release, if for some reason, through

23   a review of my actions here, the Defendant ends up with a

24   term less than what I've just done or he survives that many

25   years in prison.  I'm going to waive the fine.  Going to

1   impose the restitution of $3,250.  I will leave that open

2   for a period of 90 days in case the U.S. Attorney's office

3   determines that the victims have additional restitution they

4   didn't know about as of today.

5           With the supervision, should Defendant be released

6   from incarceration, I will impose a special condition of

7   mental health evaluation and treatment; the Defendant not --

8   the Defendant permit Probation to have access to his

9   personal computer; that he participate in a sex offender

10  treatment program; that he not possess electronic devices

11  capable of taking photographs, videos, or text messages;

12  that he be prohibited from using or accessing a computer for

13  the purpose of accessing, downloading, or receiving

14  pornographic material; that he submit to a search in the

15  event of a suspicion of contraband or violation of his

16  conditions of supervision; that he not have any contact with

17  minor males under the age of 18, unless in the presence of

18  an adult, responsible adult; that he not affiliate with any

19  organization or voluntary activities that would place him in

20  regular contact with minor males under the age of 18; that

21  'til such time as his restitution obligation is met, that he

22  provide the probation officer and the Financial Litigation

23  Unit of the U.S. Attorney's office with access to any

24  requested financial information; that any income tax

25  refunds, lottery winnings, judgments, unexpected financial

1  gains be applied to his financial obligations; that he

2  forfeit interest in the I-Phone and the computer.

3       Before I formally impose sentence, Mr. Gabel -- I

4  understand you're not at all in agreement with my sentence,

5  but do you believe I addressed your mitigating -- your

6  arguments in mitigation, both those you made orally and

7  those you made in writing?

8       *MR. GABEL:*  Your Honor, you addressed them.  I

9  disagree with your outcome.

10      *THE COURT:*  I understand.  Do you have any

11 objection to the special conditions I've proposed to apply

12 for supervised release?

13      *MR. GABEL:*  No, Your Honor.

14      *THE COURT:*  Ms. Summers, do you have any additional

15 conditions that you believe I should have considered?

16      *MS. SUMMERS:*  No, Your Honor.

17      *THE COURT:*  Very well.  I will proceed with the

18 formal imposition of sentence then as follows:

19      The Court, having considered all of the information

20 in the Presentence Report, including the guideline

21 computations and the factors set forth in 18 United States

22 Code, Section 3553(a), and pursuant to the Sentencing Reform

23 Act of 1984, it is the judgment of the Court that the

24 Defendant, Christopher Michael Horton, is hereby committed

25 to the custody of the Bureau of Prisons to be imprisoned for

1   a term of 360 months on Counts 1 and 2, 360 months on

2   Counts 3 and 4, 360 months on Count 5, all such terms to run

3   consecutively; 360 months on count six, to run concurrent

4   with Counts 1 through 5, for a total term of 1,080 months.

5        It's ordered Defendant shall pay the United States

6   a Special Assessment of $600, payable through the Clerk of

7   the United States District Court.  It's ordered Defendant

8   make restitution in the amount of $3,250 to the following

9   payees.  The payments will be made directly to the Clerk of

10  the United States District Court who will then forward the

11  payments to the payees.  Payees will be -- I'm not going to

12  state their name here in open court, but the parents of

13  Minor 1 in the amount of $400; parents of Minor 2 in the

14  amount of $500; parents of Minor 3 in the amount of $1,700;

15  parents of Minor 4 in the amount of $650.  The restitution

16  is due immediately.  Defendant's required to notify the

17  court and the Attorney General of any material change in his

18  economic circumstances that would affect his ability to pay

19  restitution.  Defendant shall notify the United States

20  Attorney for this district within 30 days of any change of

21  mailing or residence that occurs while any portion of the

22  restitution remains unpaid.  Court finds that Defendant does

23  not have the ability to pay interest and it is waived.

24  Further ordered that a fine in this case is waived.

25        Further ordered Defendant shall notify the United

 1    States Attorney for this district within 30 days of any

 2    change of name, residence, or mailing address until all

 3    fines restitution -- I'm sorry, until all restitution and

 4    Special Assessments imposed by this judgment are fully paid.

 5    Having assessed the Defendant's ability to pay, payment of

 6    the total criminal monetary penalties shall be paid in equal

 7    monthly installments of $25, or 10 percent of his net

 8    monthly income, whichever's greater.  Defendant shall pay

 9    any financial penalty that is imposed by this judgment that

10    remains unpaid at the commencement of the term of supervised

11    release.

12         Upon release from imprisonment the Defendant shall

13    be placed on supervised release for a term of life on all of

14    Counts 1 through 6, all terms to run concurrently.  Within

15    72 hours of release from the custody of the Bureau of

16    Prisons the Defendant shall report in person to the

17    United States Probation Office in the district to which he's

18    released.

19         While on supervised release, the Defendant shall

20    comply with the following mandatory conditions:  Defendant

21    shall not commit another federal, state, or local crime.

22    Defendant shall not unlawfully possess a controlled

23    substance and shall refrain from the unlawful use of a

24    controlled substance.  As there is no indication of recent

25    substance abuse, the Court suspends mandatory drug testing.

1    Defendant shall not possess a firearm, ammunition,

2    destructive device, or other dangerous weapon.  Defendant

3    shall cooperate in the collection of DNA as directed by the

4    probation officer.  Defendant shall pay any fines or

5    restitution in accordance with the schedule, and that should

6    be just restitution in accordance with the schedule of

7    payments as ordered by the Court.  Defendant shall comply

8    with the requirements of the Sex Offender Registration and

9    Notification Act as directed by the probation office, the

10   Bureau of Prisons, or any state offender registration agency

11   in which he or -- in which he resides, works, is a student,

12   or was convicted of a qualifying offense.  Defendant must

13   comply with the standard conditions that have been adopted

14   by the Court, as well the following additional special

15   conditions:

16        Due to concerns related to the Defendant's mental

17   health, the Defendant shall participate in a program of

18   mental health treatment, which may include cognitive skills

19   or other forms of therapy or counseling that may be

20   recommended as directed by the probation officer.  This may

21   include a mental health assessment and/or psychiatric

22   evaluation.  This may require participation in a medication

23   regimen prescribed by a licensed practitioner at the

24   direction of the probation officer.  Defendant shall pay for

25   the costs associated with services rendered based on a

1    Court-approved sliding fee scale as directed by the

2    probation officer.  Defendant's financial obligation shall

3    never exceed the total cost of services rendered.

4         Based on the nature of the offense and -- the

5    offense and Defendant's history, the Defendant shall permit

6    the probation officer to have access to any personal

7    computer and/or electronic device capable of accessing the

8    internet, worldwide web, or electronic mail.  Defendant

9    shall also allow the probation officer or designee searches

10   of his computer and/or electronic device using software

11   monitoring devices if determined necessary by the probation

12   officer.  Defendant shall advise the probation officer of

13   all e-mail addresses used on both public and private

14   computers.  Defendant shall consent to third-party

15   disclosure to any employer or potential employer concerning

16   any computer-related restrictions that may be imposed.

17   Defendant shall inform other residents or occupants of his

18   home that computer systems accessed by the Defendant will be

19   subject to inspection by the probation officer and/or

20   authorized contractor.

21        Defendant shall participate in approved sex

22   offender treatment program as directed by the probation

23   officer.  If deemed necessary, the Defendant shall submit to

24   an approved sexual predator evaluation as directed by the

25   probation officer.  Defendant shall abide by all rules,

1   requirements, and conditions of the treatment program,

2   including submission to polygraph and/or plethysmograph

3   examination to determine compliance with conditions of

4   release.  Defendant shall remain in the program until

5   successfully completed or until such time as the Defendant

6   is released from the program by the Court and/or probation

7   officer.  Defendant shall pay for the costs associated with

8   services rendered based on a Court-approved sliding fee

9   scale as directed by the probation officer.  Defendant's

10  financial obligation shall never exceed the total cost of

11  services rendered.

12          Defendant shall not possess or use electronic

13  devices capable of taking photographs or videos.  He shall

14  not subscribe to any text messaging services.  Defendant

15  shall be prohibited from using or accessing the computer for

16  the purpose of accessing, downloading, transferring, and/or

17  receiving pornographic material.

18          Due to the nature of the offense, the Defendant's

19  history, he shall submit to a search at any time, with or

20  without a warrant, and by any law enforcement or probation

21  officer of the Defendant's person property, house,

22  residence, vehicle, papers, computer, other electronic

23  communication or data storage devices or media, and effects

24  upon reasonable suspicion concerning a violation of a

25  condition of supervision or unlawful conduct by the

1   Defendant or by any probation officer in the lawful

2   discharge of the officer's supervision functions.  Failure

3   to submit to a search may be grounds for revocation.

4   Defendant shall inform any other residents that the premises

5   may be subject to a search pursuant to this condition.

6          Based on the nature of the offense and Defendant's

7   history, he shall not have any contact with minor males

8   under the age of 18, unless in the presence of a responsible

9   adult who is aware of the nature of Defendant's background

10  and instant offense, and who has been approved by the

11  probation officer.  The Defendant shall not affiliate with,

12  own, control, or be employed in any capacity by a business

13  organization and/or voluntary activity that causes him to

14  directly contact minor males under the age of 18.

15         Defendant shall provide the probation officer and

16  the Financial Litigation Unit of the United States

17  Attorney's Office with access to any requested financial

18  information.  Defendant's advised that the probation office

19  may share financial information with the Financial

20  Litigation Unit.  Defendant shall apply all monies received

21  from income tax refunds, lottery winnings, judgments, and

22  any other anticipated or unexpected financial gains to the

23  outstanding Court-ordered financial obligation.  Defendant

24  shall immediately notify the probation officer of the

25  receipt of any indicated monies.

1              In addition to the sentence imposed, the Defendant

2    shall forfeit interest in the following property to the

3    United States:  Apple I-Phone contained in a red and black

4    Griffin protective case; a SATA 120 gigabyte Western Digital

5    Hard Drive Mode; an IDE 20 gigabyte Hitachi Hard Drive; and

6    an Alienware laptop with unknown make/model hard drive

7    and/or internal memory with the markings of "Made in China"

8    and an embroidered nameplate displaying the words, "Built

9    for Chris Horton (NINJA)".

10             Sentence is within the guideline range which does

11   not exceed 24 months, and the Court finds no reason to

12   depart from the sentence called for by the application of

13   the guidelines.

14             Mr. Horton, you can appeal your conviction if you

15   believe your guilty plea was somehow unlawful, involuntary,

16   or if there's some other fundamental defect in the

17   proceedings not waived by your guilty plea.  You also have a

18   statutory right to appeal your sentence under certain

19   circumstances, particularly if you think the sentence is

20   contrary to law.  With few exceptions, any notice of appeal

21   must be filed within 14 days of judgment being entered in

22   your case.  If you're unable to afford the services of an

23   attorney to handle an appeal, counsel will be appointed for

24   you.  If you cannot afford it, a transcript of the record in

25   the case will be prepared for such appeal at Government's

1    expense.  The Clerk of the Court can and will file a Notice

2    of Appeal on your behalf.  They don't do that automatically,

3    Mr. Horton; they only do that if you specifically and

4    directly ask them to do that.

5            Do you have any questions about your appeal rights,

6    Mr. Horton?

7            *MR. GABEL:*  Your Honor, I'm going to be filing an

8    appeal, my office.

9            *THE COURT:*  Very well.  Anything else I need the

10   talk about, Melissa?

11            *PROBATION OFFICER:*  No, sir.

12            *THE COURT:*  Sara?

13            *COURTROOM DEPUTY:*  No, sir.

14            *MR. GABEL:*  Your Honor, one last thing.  Would ask

15   that you recommend Marion for my client's assignment.

16            *THE COURT:*  I assumed you'd be doing that.

17   Ms. Summers, anything else?

18            *MS. SUMMERS:*  Nothing further, Your Honor.

19            *THE COURT:*  Very well, we stand adjourned.

20       **(Court adjourned)**

21                    *   *   *   *

22

23

24

25

1                        REPORTER'S CERTIFICATE

2

3          I, Laura A. Blatz, RPR, Official Court Reporter for the
    U.S. District Court, Southern District of Illinois, do
    hereby certify that I reported in shorthand the proceedings
4   contained in the foregoing 96 pages, and that the same is a
    full, true, correct, and complete transcript from the record
5   of proceedings in the above-entitled matter.

6          Dated this 3rd day of April, 2014.

7

8                                   _____

9                                   LAURA A. BLATZ, RPR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25